**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RICKY DAVID SECHREST,
            *Petitioner-Appellant,*

v.

JOHN IGNACIO, Warden,
            *Respondent-Appellee.*

No. 04-99004

D.C. No.
CV-N-92-0536-ECR

OPINION

Appeal from the United States District Court
for the District of Nevada
Edward C. Reed, District Judge, Presiding

Argued and Submitted
February 15, 2007—Pasadena, California

Filed December 5, 2008

Before: Harry Pregerson, William A. Fletcher, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Pregerson

15975

## COUNSEL

Franny A. Forsman, Tiffany R. Murphy, and Michael Pescetta, Federal Public Defender's Office, Las Vegas, Nevada, for the petitioner-appellant.

George J. Chanos and David K. Neidert, Office of the Nevada Attorney General, Reno, Nevada, for the respondent-appellee.

## OPINION

PREGERSON, Circuit Judge:

In this pre-AEDPA capital case, Ricky David Sechrest appeals the denial of his third amended petition for a writ of habeas corpus under 28 U.S.C. § 2254.[1] We affirm in part, reverse in part, and remand for further proceedings.

---

[1]AEDPA, the Antiterrorism and Effective Death Penalty Act of 1996, altered the role of the federal habeas court in reviewing state prisoner applications brought under 28 U.S.C. § 2254. *See Bell v. Cone*, 535 U.S. 685, 693 (2002). Under AEDPA, a federal court may reject a state court's

## JURISDICTION

We have jurisdiction over the district court's denial of Sechrest's third amended federal habeas petition pursuant to 28 U.S.C. §§ 1291 and 2253(c).

## FACTUAL BACKGROUND

On May 14, 1983, twenty-two-year-old Ricky Sechrest kidnapped and murdered ten-year-old Maggie Weaver and nine-year-old Carly Villa. A few weeks later, two men found the girls' bodies in Logomarsino Canyon, a remote area east of Reno, Nevada.

On June 14, 1983, Sechrest was arrested by the Sparks, Nevada police on an unrelated grand larceny charge. Detective Wright of the Sparks police informed Sechrest of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and asked Sechrest if he wanted to talk about the grand larceny charge. Sechrest replied that he wished to speak with his attorney. At that point, questioning ceased.

The Sparks police then took Sechrest to the station for booking. While Sechrest was waiting to be booked, he turned to Detective Wright and another officer, Sergeant Gonyo, and said, "I like you two guys, I don't want an attorney, I will talk with you." The officers finished booking Sechrest and gave him a standard form for waiving his *Miranda* rights. Sechrest read and signed this form in the presence of the officers.

_____

judgment only if it was "contrary to" or "involved an unreasonable application of" clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). However, AEDPA does not apply to the merits of petitions filed before April 24, 1996, the effective date of the Act. *See Caswell v. Calderon*, 363 F.3d 832, 836 n.3 (9th Cir. 2004). Because Sechrest filed his first federal habeas petition before AEDPA's 1996 enactment, AEDPA does not affect our analysis in this case.

The Sparks officers proceeded to question Sechrest about the grand larceny charge. During questioning, Sechrest stated that the Reno police were investigating him as a possible suspect in a homicide. The Sparks officers, however, did not question Sechrest about the homicide.

When the Sparks officers finished questioning Sechrest, Sergeant Gonyo left the room. He returned to inform Sechrest that Officer Bogison of the Reno Police Department was outside. Sergeant Gonyo asked Sechrest if he would like to talk to Officer Bogison, with whom Sechrest had spoken over the past few days. Sechrest replied, "Yes, I like Mr. Bogison, he is the only one on my side, and [he] understands me." Officer Bogison then approached Sechrest and said, "I understand you want to talk to me, is that right?" Sechrest replied, "Yes." Sechrest also stated that he had spoken with his attorney and had been advised to "keep his mouth shut." Officer Bogison responded, "Well, there is nothing we can do to alter that . . . do you want to talk to me?" Sechrest replied, "I will tell you what, I will make a deal—no, I won't make a deal. You ask some questions, and if I want to answer them, I will answer them, and if not, I won't." Bogison then asked again, "Does this mean you want to talk to us?" Sechrest answered, "Yes."

Sechrest entered an interrogation room with Officer Bogison and another Reno officer, Detective Eubanks. Before the interrogation began, Sechrest requested permission to call his grandmother and his attorney. Sechrest first called his grandmother. When that call ended, Officer Bogison asked Sechrest if he wished to call his attorney. Sechrest said, "No, I want to get this off my chest." Shortly thereafter, Sechrest confessed to the two murders.

Before trial, Sechrest moved under *Miranda* to suppress the confession he made to the Reno police officers. Following an evidentiary hearing, the trial judge ruled that Sechrest's *Miranda* rights had not been violated and that Sechrest's confession could be admitted into evidence.

Sechrest's seven-day jury trial began on September 12, 1983, in Nevada's Second Judicial District Court. During his voir dire of the jury, the prosecutor made two statements suggesting that Sechrest would not actually serve a full term of life imprisonment if he were sentenced to life in prison without the possibility of parole:

> *Statement #1*: The judge is going to give you an instruction at the penalty phase, if we get there, that he will impose the penalty that you say, but if you say life in prison without parole, that doesn't mean that the pardons board can't let him out. Now, would you consider that when you arrive at your verdict?

> *Statement #2*: Okay. Now, [defense counsel] has talked a lot about the possible penalties if we get there being life with possibility of parole, life without possibility of parole and death. And His Honor will, I imagine, because many times I have been in front of His Honor, will give you a charge, a jury instruction saying if you impose life without parole that really doesn't mean life forever. If he gives you that charge, will you take that into consideration in deciding what the verdict ought to be?

Defense counsel did not object to these statements.

On September 19, 1983, the jury convicted Sechrest of two counts of first degree murder and two counts of first degree kidnaping.

The penalty phrase of Sechrest's trial began on September 26, 1983. The prosecution's primary penalty phase witness was Dr. Lynn M. Gerow. Dr. Gerow's involvement in the case began several months before trial when, at defense counsel's request, the trial judge appointed Dr. Gerow to conduct a psychiatric evaluation of Sechrest. Using Dr. Gerow's evaluation, defense counsel sought to determine whether Sechrest

was fit to stand trial, and to investigate the possibility of an insanity defense.

Dr. Gerow interviewed and evaluated Sechrest. He then submitted a report addressed to defense counsel marked "Confidential." The report contained information about Sechrest's criminal history and past drug use. In the report, Dr. Gerow stated that Sechrest had a "polymorphous perversion." After reviewing the report and speaking with Dr. Gerow, defense counsel decided not to call Dr. Gerow as a witness at the penalty phase and not to pursue an insanity defense.

The prosecutor then asked defense counsel to permit the use of Dr. Gerow's report and to permit the prosecutor to call Dr. Gerow as a prosecution witness during the penalty phase. Defense counsel, who last communicated with Dr. Gerow about two months before trial, stipulated to the prosecution's request and did not object when Dr. Gerow took the stand. Dr. Gerow testified that he had evaluated Sechrest at defense counsel's request. He further testified that Sechrest was an "incurable sociopath" with an extensive criminal record and a history of drug use.

In front of the jury at the penalty phase, the prosecutor made sure the record showed that defense counsel had acquiesced in the prosecution's request to call Dr. Gerow as a prosecution witness. The prosecutor frequently referred to Dr. Gerow's testimony when examining penalty phase witnesses and when making his closing argument. Moreover, during closing argument, the prosecutor made two additional statements to the jury emphasizing that the Board of Pardon Commissioners could change Sechrest's sentence and that prisoners never serve their full life sentences, even when the life sentence states that it is imposed without the possibility of parole:

> *Statement #3:* Now, the judge has told you that if you return a verdict, whatever verdict you return, he

will impose. He also told you, and it is very impor-
tant under the laws of this state, the State of Nevada,
any sentence imposed by the jury may be refused by
the State Board of Pardon commissioners. Whatever
sentence you return in your verdict this Court will
impose that sentence. Whether or not the State Board
of Pardon commissioners, upon review, if requested
by the defendant, would change that sentence, the
Court has no way of knowing. Indeed, you don't
either. The State Board of Pardon commissioners,
however, would have the power to modify any sen-
tence at a later date. And what that means is, let's
say you fall — I am going to talk about his defense.
It was a fraud. And let's say you fall for that fraud
and you say well, gee, I just can't bring myself to do
what I should do, and I am going to impose life with-
out parole. You don't die in prison of old age. People
get out. Now, are you prepared to risk the life of
some other person or child by giving him the oppor-
tunity to get out? That will be your risk. That will be
your burden.

*Statement #4*: Never getting out. As the judge has
instructed you, the pardons board has the ultimate
authority to review any sentence, to pardon anybody.
If you return a verdict of life without possibility of
parole, I represent to you as a lawyer, as an attorney
for the people of this county, that the pardons board
has the authority to commute that tomorrow if they
want to. They won't, of course, but they have the
authority to. So don't buy that he is going to go to
jail forever. It just doesn't happen.

Defense counsel did not object to these statements.

After closing argument at the penalty phase, the trial judge
issued penalty phase jury instructions, which included the fol-
lowing:

If the penalty is fixed at life imprisonment with the possibility of parole, eligibility for parole begins when a minimum of ten years has been served.

If the penalty is fixed at life imprisonment without the possibility of parole, the defendant shall not be eligible for parole.

Under the laws of the State of Nevada, any sentence imposed by the jury may be reviewed by the State Board of Pardon Commissioners. Whatever sentence you return in your verdict, this Court will impose that sentence. Whether or not the State Board of Pardon Commissioners upon review, if requested by the defendant, would change that sentence, this Court has no way of knowing. The State Board of Pardon Commissioners, however, would have the power to modify any sentence at a later date.

On September 27, 1983, the jury returned its verdict, imposing the death penalty for each of the two murders. The jury found four aggravating factors for each murder: (1) that the murder involved torture, depravity of the mind, or mutilation of the victim; (2) that the murder was committed to prevent or avoid a lawful arrest or to effect an escape from custody; (3) that the murder was committed during the commission or the attempted commission of a kidnaping; and (4) that the murder was committed during the commission or attempted commission of a sexual assault.

The trial judge, in accordance with the jury's verdict, sentenced Sechrest to the penalty of death for each of the two murders. The trial judge also sentenced Sechrest to two terms of life in prison without the possibility of parole for each of the two kidnaping convictions.

## PROCEDURAL BACKGROUND

Sechrest appealed his convictions and sentences on several grounds to the Nevada Supreme Court. On August 27, 1985,

the Nevada Supreme Court affirmed both his convictions and his sentences. *Sechrest v. State*, 705 P.2d 626 (Nev. 1985).

On November 13, 1985, Sechrest filed a petition for post-conviction relief in the Nevada state district court. Sechrest argued that he was denied effective assistance of counsel during the penalty phase of his trial because his attorney failed to prevent Dr. Gerow from testifying for the prosecution. After conducting an evidentiary hearing on Sechrest's petition on November 8, 1990, the Nevada state district court concluded that counsel's performance had been constitutionally deficient. Nevertheless, the state district court held that Sechrest had failed to demonstrate prejudice and denied the petition. Sechrest appealed the state district court's denial of post-conviction relief to the Nevada Supreme Court, which affirmed the state district court's denial on February 20, 1992. *Sechrest v. State*, 826 P.2d 564 (Nev. 1992).

On August 13, 1992, Sechrest filed a pro se federal petition for a writ of habeas corpus. The district court appointed counsel for Sechrest, and Sechrest filed an amended habeas petition on October 31, 1994. On September 25, 1995, the district court dismissed the amended petition with leave to amend.

On October 27, 1995, Sechrest filed a second amended federal habeas petition raising thirty-five claims of various constitutional violations that occurred during both the guilt and penalty phases of his trial.[2] The district court held that four of Sechrest's claims had been properly exhausted in state court, but thirty-one had not. Accordingly, the district court ruled that Sechrest's second amended petition was a "mixed petition," containing both exhausted and unexhausted claims. Because federal law prohibits the consideration of mixed petitions, *Rose v. Lundy*, 455 U.S. 509, 522 (1982), the district

---

[2]Several of Sechrest's ineffective assistance counsel claims contained subparts. The district court counted each of these subparts as individual habeas claims.

court dismissed the second amended petition without prejudice to allow Sechrest to pursue his unexhausted claims in state court.

Sechrest appealed the district court's dismissal of his second amended petition to this court. While that appeal was pending, Sechrest filed a second post-conviction petition in Nevada state court in an attempt to exhaust his unexhausted claims. On September 4, 1996, the Nevada state district court dismissed that petition under Nevada Revised Statute § 34.810 ("NRS 34.810"). NRS 34.810 provides that a petition shall be dismissed if the court determines that the grounds for the petition could have been raised in an earlier proceeding, unless the court finds both cause for the failure to present the grounds earlier and actual prejudice to the petitioner.

On November 20, 1997, the Nevada Supreme Court affirmed the state district court, holding that Sechrest's habeas claims that had not been raised in the earlier state proceedings were procedurally defaulted under NRS 34.810. *Sechrest v. State*, No. 29170 (Nev. Nov. 20, 1997). The Nevada Supreme Court ruled that Sechrest had failed to show good cause for his failure to raise the claims earlier and had failed to demonstrate that his unexhausted claims had any merit. The Nevada Supreme Court concluded that only five of Sechrest's claims had been exhausted during the prior state proceedings: (1) denial of a fair trial because of prosecutorial misconduct regarding comments on executive clemency, (2) violation of Sixth Amendment right to effective assistance of counsel because of failure of trial court to appoint Sechrest a second attorney, (3) violation of Fifth Amendment right against self-incrimination by admission into evidence of petitioner's statements to police, (4) violation of Fifth Amendment right against self-incrimination because of admission into evidence of Dr. Gerow's testimony, and (5) violation of Sixth Amendment right to effective assistance of counsel because of trial

counsel's failure to prevent or prepare for Dr. Gerow's testimony.

Relying on the Nevada Supreme Court's decision, we dismissed Sechrest's appeal of his second amended federal habeas petition. *Sechrest v. Del Papa*, 161 F.3d 14 (Table), 1998 WL 551984 at *2 (9th Cir. Aug. 27, 1998) (unpublished memorandum disposition). Citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), we held that the claims deemed procedurally defaulted by the Nevada Supreme Court under NRS 34.810 were outside federal habeas jurisdiction. *Id.* at *1. We remanded Sechrest's second federal petition to the district court, instructing the district court to "vacate its order dismissing the petition, permit [Sechrest] to delete the claims which are procedurally barred, and then proceed to determine the merits of the five [ ]exhausted[3] claims." *Id.* at *2. We noted that if Sechrest "[did] not delete the procedurally barred claims, then the district court should deny the petition." *Id.*

On remand, the district court ordered supplemental briefing on the procedural default issue. The State objected, arguing that this court had already ruled on that issue. Initially, the district court disagreed with the State and reiterated its request that the parties submit briefing on the procedural default issue. Ultimately, however, the district court agreed with the State and issued an order indicating that it would accept an amended petition from Sechrest "in accordance with the order of the Ninth Circuit Court of Appeals and the Nevada Supreme Court."

Complying with the district court's order, Sechrest filed a third amended federal habeas petition on May 20, 1999, omitting the claims deemed procedurally barred and raising his

---

[3]The original disposition inadvertently stated that the district court should "proceed to determine the merits of the five *un*exhausted claims." On September 16, 1998, we filed an order amending our disposition to correct that misstatement. We cite the corrected language above.

five remaining claims. On April 19, 2004, the district court issued an order denying on their merits all five claims contained in the third amended habeas petition.

Sechrest filed a motion for reconsideration of the district court's order. In that motion, Sechrest asked the district court to reconsider its ruling on his third amended petition, and to re-evaluate those claims that had been deemed procedurally defaulted. On June 3, 2004, the district court denied Sechrest's motion for reconsideration.

Sechrest then filed an application for a certificate of appealability with the district court. On December 3, 2004, the district court granted the certificate of appealability on four of the five claims raised in Sechrest's third amended federal petition, and on the correctness of the procedural default ruling. Those issues are before us now.

## STANDARD OF REVIEW

Because Sechrest filed his original federal habeas petition before April 24, 1996, AEDPA's standard of review does not apply. *Summerlin v. Schriro*, 427 F.3d 623, 628 (9th Cir. 2005) (en banc). Accordingly, we "simply resolve the legal issue[s] on the merits, under the ordinary rules." *Id.* at 628 (internal quotation and citation omitted). We review the district court's denial of Sechrest's habeas petition de novo and its factual findings for clear error. *Id.* at 628.

## DISCUSSION

### I.

We begin by deciding whether the claims that the Nevada Supreme Court dismissed under NRS 34.810 were properly barred from federal habeas review. We hold that these claims should not have been barred, and remand so that the district court may consider them on their merits.

A.

**[1]** Under the principles governing procedural default, a federal district court cannot review a habeas petitioner's claimed denial of a constitutional right if the petitioner failed to present the claim in state court because of a procedural default in that court. *Valerio v. Crawford*, 306 F.3d 742, 773 (9th Cir. 2002) (en banc). "A default under an independent and adequate state procedural rule operates as a bar in federal court unless the petitioner can show cause for and prejudice from the default." *Id.* (citing *Wainwright*, 433 U.S. at 72; *Wells v. Maass,* 28 F.3d 1005, 1008 (9th Cir. 1994)). "[T]o constitute adequate and independent [state] grounds sufficient to support a finding of procedural default, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default." *Wells*, 28 F.3d at 1010.

Our 1998 memorandum disposition in this matter held that the claims deemed procedurally defaulted under NRS 34.810 were barred from federal habeas review. 1998 WL 551984 at *2. We recognize that we are generally precluded under the "law of the case" doctrine from reconsidering an issue that has already been decided by the same court in the identical case. *United States v. Cuddy*, 147 F.3d 1111, 1114 (9th Cir. 1998). However, we have discretion to depart from a prior decision if "(1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial." *Minidoka Irrigation Dist. v. U.S. Dep't of Interior*, 406 F.3d 567, 573 (9th Cir. 2005) (quoting *Old Person v. Brown*, 312 F.3d 1036, 1039 (9th Cir. 2002)). As we discuss below, this court's 2002 en banc decision in *Valerio* was intervening controlling authority that makes reconsideration of our 1998 memorandum disposition appropriate here.

In *Valerio*, we examined the application of NRS 34.810 under circumstances almost identical to those present here.

306 F.3d 742. After filing an unsuccessful petition for post-conviction relief in Nevada state court in 1990, the petitioner in *Valerio* filed a federal habeas petition in 1992, which the federal district court dismissed as mixed under *Rose*. *Id.* at 748-49. The petitioner then filed a second state petition for post-conviction relief in Nevada state district court in an attempt to exhaust his unexhausted claims. *Id.* at 749. The state district court dismissed the entire petition as procedurally barred under NRS 34.810, and the Nevada Supreme Court affirmed. *Id.*

The petitioner then returned to federal district court and filed a second federal habeas petition. *Id.* In that petition, he asserted the same claims for relief he had presented to the Nevada state courts in his second petition for post-conviction relief. *Id.* In 1998, the federal district court dismissed most of the petitioner's claims as barred from federal habeas review under NRS 34.810, and the petitioner appealed. *Id.*

On en banc review, we agreed with petitioner that his claims should not have been barred as procedurally defaulted under NRS 34.810 because the Nevada courts had not applied NRS 34.810 "with sufficient clarity and regularity." *Id.* at 773. We noted that NRS 34.810 authorizes the Nevada courts to dismiss claims that could have been raised on direct appeal or in a prior petition for post-conviction relief unless the court finds both cause for the failure to present the grounds and actual prejudice to the petitioner. *Id.* at 771. Had this rule been regularly adhered to, the Nevada courts should have dismissed *all* claims for post-conviction relief that could have been brought in an earlier petition. Our in-depth review of Nevada case law, however, revealed that, when the petitioner in *Valerio* filed his first petition for post-conviction relief in 1990, the Nevada Supreme Court had a policy in capital cases of "exercising discretionary *sua sponte* power to overlook failures to present constitutional claims in earlier proceedings." *Id.* at 776. Because the Nevada Supreme Court exercised a "general discretionary power" to address defaulted

constitutional claims in capital cases, the Nevada Supreme Court did not "adhere regularly" to the requirements of NRS 34.810. *Id.* at 778.

[2] We therefore concluded that NRS 34.810 was an inadequate state procedural bar to federal habeas review. *Id.* We explicitly noted that this conclusion comported with our decisions in *Petrocelli v. Angelone*, 248 F.3d 877 (9th Cir. 2001), and *McKenna v. McDaniel*, 65 F.3d 1483 (9th Cir. 1995), which held that the Nevada courts had inconsistently applied NRS 34.810 as early as 1985, in both direct appeal and habeas proceedings. *Id.*

[3] *Valerio* controls the outcome of the procedural default issue in this case. Here, Sechrest's default occurred on November 13, 1985, when he filed his first petition for post-conviction relief in the Nevada state district court. *See id.* at 776 (explaining that default occurs at the time the first petition for post-conviction relief is filed). *Valerio* demonstrates that, in 1985, there was no clear, consistently applied, and well-established rule that barred Sechrest from asserting in a later petition claims that he failed to assert in his first petition. *Id.* at 778. Therefore, NRS 34.810 is inadequate to bar federal habeas review of the claims deemed procedurally defaulted by the district court.

[4] Because we conclude that our earlier procedural default ruling, 1998 WL 551984 at *2, should not stand, we must now decide whether "jurists of reason would find it debatable" whether the defaulted claims stated valid "denial[s] of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 478 (2000). To do so, we simply take a "quick look" at the face of the petition. *Petrocelli*, 248 F.3d at 885 (citations omitted).

Here, our "quick look" reveals that all the defaulted claims alleged the denial of a constitutional right. In his second amended petition, Sechrest raised several Sixth Amendment ineffective assistance of counsel claims for errors that

occurred during the guilt and penalty phases of his trial. He also argued that death by lethal injection violates the Eighth Amendment's prohibition against cruel and unusual punishment. These claims clearly state potential constitutional violations.

Furthermore, Sechrest challenged the constitutionality of the four aggravating factors that the jury considered when sentencing him to death. We have already held in *Valerio* that one of these aggravating factors—the "depravity of mind" factor—is unconstitutionally vague. 306 F.3d at 750-51; *see also Deutscher v. Whitley*, 884 F.2d 1152, 1161 (9th Cir. 1989), *vacated on other grounds sum nom.*, *Angelone v. Deutscher*, 500 U.S. 901 (1991). Moreover, the Nevada state district court has since held that the two "felony-murder" aggravating factors applied in Sechrest's case—that the murder was committed during the commission or the attempted commission of a kidnaping, and that the murder was committed during the commission or attempted commission of a sexual assault—"must be stricken as invalid" under *McConnell v. State*, 102 P.3d 606 (Nev. 2004). *Sechrest v. McDaniel*, Second Judicial Dist. Ct., Case No. C83-1014 (Apr. 5, 2007) (unpublished order). Therefore, at least one (and possibly three) of Sechrest's dismissed claims is not only a constitutional claim; it is meritorious.

**[5]** Sechrest has shown that the dismissed claims alleged potential denials of his constitutional rights. Accordingly, we conclude that those claims should not have been barred from federal habeas review.

### B.

The State does not dispute the application of *Valerio* to Sechrest's case. Instead, the State contends that Sechrest waived the procedural default issue when he filed a third amended federal habeas petition omitting the supposedly defaulted claims.

**[6]** Generally, amendment of a complaint or petition constitutes waiver of any omitted arguments or claims from previous versions of the complaint or petition. *See Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474 (9th Cir. 1997). The filing of a new petition cancels out and waives any claims from the old petition. The cases establishing these rules, however, all deal with *voluntary* waiver. *See, e.g.*, *London v. Coopers & Lybrand*, 644 F.2d 811, 814 (9th Cir. 1981); *Loux v. Rhay*, 375 F.2d 55, 57 (9th Cir. 1967). This is not such a case. In our 1998 memorandum disposition, we held that Sechrest's claims were procedurally barred from federal habeas review. 1998 WL 551984 at *2. We specifically stated that if Sechrest failed to delete these claims, his entire petition should be denied. *Id.* Complying with our mandate, the district court required Sechrest to file a third amended federal habeas petition "in accordance with the order of the Ninth Circuit Court of Appeals and the Nevada Supreme Court." Thus, Sechrest had to delete the defaulted claims, on pain of having his entire habeas petition denied. Under such circumstances, we cannot conclude that he voluntarily waived his claims.[4] *See, e.g.*, *Wilson v. First Houston Inv. Corp.*, 566 F.2d 1235, 1238 (5th Cir. 1978), *vacated on other grounds*, 444 U.S. 959 (1979) ("It . . . is not logical to deny a party the right to appeal simply because he decides to abide by the court's order and amend his pleading rather than allowing judgment to be entered against him . . . .").

**[7]** We also find that the doctrine of judicial estoppel prevents the State from prevailing in its waiver argument. *See Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001) ("Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position."). In district court, the State

---

[4]We note that our ruling requiring the deletion of procedurally defaulted claims was incorrect. Unexhausted claims must be deleted, not procedurally defaulted claims. *See Valerio*, 306 F.3d at 770.

successfully argued that Sechrest was bound by the terms of our prior decision to *delete* the defaulted claims. The State cannot now argue that Sechrest was at liberty to *include* those same claims in his third amended federal habeas petition.

Finally, we reject the State's argument that Sechrest did not raise the procedural default issue in a timely manner because he first addressed it in a motion for reconsideration. Sechrest had already raised the procedural default issue in this court. The State was well aware of the issue and suffered no prejudice when Sechrest raised it in his motion for reconsideration

**[8]** We conclude that the habeas claims the Nevada Supreme Court dismissed under NRS 34.810 should not have been barred from federal review. We reverse and remand to the district court for consideration of those claims on the merits.[5]

## II.

We next address Sechrest's claims challenging the validity of his conviction. Sechrest argues that the Reno police officers violated his *Miranda* right to remain silent and his *Miranda* right to counsel when they questioned him at the Sparks police station on July 14, 1983.[6] Sechrest contends that his confession was therefore the product of compulsion and should not have been admitted into evidence at trial.

*Miranda* claims present mixed questions of law and fact which we review de novo. *See Thompson v. Keohane*, 516 U.S. 99, 106-16 (1995). We hold that Sechrest's *Miranda* rights were not violated and affirm the district court on this issue.

---

[5]As we later conclude, for separate reasons, that there were due process violations during the penalty phase of the trial, the claims that go to due process violations in sentencing need not be revisited. We remand for consideration of the other claims dismissed under NRS 34.810.

[6]Sechrest concedes that he waived his *Miranda* rights when he chose to speak with the Sparks officers about the grand larceny charge.

A.

Sechrest first argues that the Reno officers violated his right to remain silent. A suspect in police custody must be informed of his right to remain silent before any interrogation begins. *See Miranda*, 384 U.S. at 444. If the suspect indicates in any manner, at any time prior to or during questioning, that he wishes to invoke his right to remain silent, the interrogation must cease. *Id.* at 474. Any statement taken after the suspect's invocation of this right constitutes the product of compulsion and cannot be used as proof of guilt. *Id.*

However, "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants [to invoke the privilege]." *Davis v. United States*, 512 U.S. 452, 461 (1994). Clarifying questions "minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement." *Id.* "If the suspect's statement is not an [ ] unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning." *Id.* at 461-62.

[9] When the Sparks officers finished questioning Sechrest, Sergeant Gonyo asked Sechrest if he would like to talk to Reno Police Officer Bogison, and Sechrest answered that he would. When Officer Bogison first approached Sechrest, however, Sechrest told Officer Bogison that his lawyer had advised him to "keep his mouth shut." This statement was not a clear invocation of the right to remain silent. Although Sechrest was indicating what his lawyer had advised him to do, it was not clear that Sechrest was explaining his own intentions. An officer in Bogison's position would not necessarily have understood Sechrest's statement to be an invocation of his right to remain silent.

After Sechrest announced that his lawyer had advised him to "keep his mouth shut," Officer Bogison asked a second

time if Sechrest wanted to talk to him. Because Sechrest's statement about his attorney's advice was sufficiently vague to merit clarification, this question was permissible.

Sechrest responded to Officer Bogison's question with an ambiguous, convoluted statement. Sechrest said, "I will tell you what, I will make a deal—no, I won't make a deal. You ask some questions, and if I want to answer them, I will answer them, and if not, I won't." Once again, Sechrest's intentions were unclear. Officer Bogison asked again whether Sechrest wished to speak with him, and Sechrest said "yes." This last statement constituted a clear indication that Sechrest did not wish to invoke his right to remain silent.

**[10]** In sum, each of Officer Bogison's questions merely sought to clarify whether Sechrest was invoking his right to remain silent, and Sechrest eventually made clear that he did not wish to invoke that right. We therefore conclude that Sechrest knowingly and voluntarily waived this right before he agreed to speak with the Reno police officers.

B.

Sechrest also argues that the Reno officers violated his right to counsel under *Miranda*. "The right to counsel recognized in *Miranda* is sufficiently important to suspects in criminal investigations . . . that it 'requir[es] the special protection of the knowing and intelligent waiver standard.' " *Davis*, 512 U.S. at 458 (quoting *Edwards v. Arizona*, 451 U.S. 477, 483 (1981)). If a suspect waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him. *Id*. "But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Id.* A suspect who invokes his right to counsel cannot be questioned about any offense unless an attorney is actually present. *Id.*

Applying these rules, we begin by determining whether Sechrest actually invoked his right to counsel. *Smith v. Illinois*, 469 U.S. 91, 95 (1984). This is an objective inquiry. *Davis*, 512 U.S. at 458-59. There must, at a minimum, be a statement from the suspect that can "reasonably be construed to be an expression of a desire for the assistance of an attorney." *Id.* at 459 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). Where a suspect makes a reference to an attorney that is ambiguous or equivocal, the officers may continue with their questioning. The suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459.

[11] When Officer Bogison first began questioning Sechrest, Sechrest said that he had spoken with his attorney and had been advised to "keep his mouth shut." This mention of an attorney and reference to advice from an attorney is not an unambiguous request for counsel. In *Davis*, the Supreme Court examined a case where the suspect said, "Maybe I should talk to a lawyer." *Id.* at 455. The Court found that this reference to an attorney was not a clear invocation of a right to an attorney. *Id*. at 462. We have also held that the statements, "I think I would like to talk to a lawyer," and, "maybe [I] ought to see an attorney" were not clear and unambiguous requests for counsel. *Clark v. Murphy*, 331 F.3d 1062, 1070-71 (9th Cir. 2003); *United States v. Doe*, 60 F.3d 544, 546 (9th Cir. 1995). Because Sechrest's reference to his attorney's advice was even less clear than these statements, it was insufficient to require that the officers stop their questioning.

Sechrest did make a later statement that was a request for counsel. After Sechrest agreed to speak to Officer Bogison and Detective Eubanks, Sechrest asked permission to telephone his grandmother and his attorney. Sechrest decided to call his grandmother first, however. After Sechrest's conversation with his grandmother, Officer Bogison asked Sechrest

if he was going to call his attorney, but Sechrest said no. In context, Officer Bogison's question was simply an attempt to follow up on and implement Sechrest's earlier request, after a delay instigated by Sechrest. Under these specific circumstances, we find Officer Bogison's question permissible.

[12] Accordingly, we conclude that Sechrest's right to counsel was not violated when the Reno officers questioned him at the Sparks police station.

### III.

We now address Sechrest's claims challenging the validity of his death sentences. Sechrest raises three alternative claims which, if meritorious, will require the State to resentence him. We consider each claim in turn.

### A.

First, Sechrest argues that the prosecutor's statements regarding the likelihood of Sechrest's release from prison by parole misled the jury and violated his Sixth and Fourteenth Amendment due process right to a fair trial.

[13] A prosecutor's misleading and inflammatory arguments may violate a defendant's due process right to a fair trial. *Darden v. Wainwright*, 477 U.S. 168, 181-82 (1986). On federal habeas review, the narrow issue before us is whether the prosecutor's comments violated the defendant's due process right to a fair trial, not whether the prosecutor's comments constituted misconduct committed while the prosecutor was under the court's "exercise of supervisory power." *Id.* at 181.

Thus, we must examine the " 'entire proceedings' to determine whether the prosecutor's remarks 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Hall v. Whitley*, 935 F.2d 164, 165 (9th Cir.

1991) (per curiam) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Before granting relief, we must also determine that any constitutional error was not harmless. Specifically, we must find that the error "had substantial and injurious effect or influence in determining the jury's verdict."**[7]** *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Only if the record demonstrates that the jury's decision was substantially influenced by the error or there is " 'grave doubt' about whether an error affected a jury" will Sechrest be entitled to relief. *Hegler v. Borg*, 50 F.3d 1472, 1478 (9th Cir. 1995) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 438 (1995)).

After examining the entire record, we hold that the prosecutor's repeated misstatements regarding the likelihood of Sechrest's release from prison by parole were he to be sentenced to life without the possibility of parole violated Sechrest's due process right to a fair trial, and that the violation had substantial and injurious effect on the jury's sentencing decision, carried out by the trial judge, to impose the death penalty. Accordingly, Sechrest must be resentenced.

1.

Sechrest argues that the prosecutor's uncorrected assertions that the Board of Pardon Commissioners would likely release Sechrest if he did not receive the death penalty were constitutionally impermissible. We agree.

During Sechrest's trial, the prosecutor made four statements indicating that the Board of Pardon Commissioners could—and likely would—release Sechrest if the jury returned a verdict that did not impose the death penalty. We repeat the prosecutor's statements:

---

**[7]**Here, Sechrest argues that the improper statements affected *not* his guilty verdict, but the jury's decision to impose the death penalty. Therefore, our review focuses on the jury's sentencing decision.

## Statements Made During Voir Dire

*Statement #1*: The judge is going to give you an instruction at the penalty phase, if we get there, that he will impose the penalty that you say, *but if you say life in prison without parole, that doesn't mean that the pardons board can't let him out. Now, would you consider that when you arrive at your verdict*?

*Statement #2* : Okay. Now, [defense counsel] has talked a lot about the possible penalties if we get there being life with possibility of parole, life without possibility of parole and death. *And His Honor will, I imagine, because many times I have been in front of His Honor, will give you a charge, a jury instruction saying if you impose life without parole that really doesn't mean life forever. If he gives you that charge, will you take that into consideration in deciding what the verdict ought to be?*

### Statements Made During Closing Argument of the Penalty Phase

*Statement #3:* Now, the judge has told you that if you return a verdict, whatever verdict you return, he will impose. *He also told you, and it is very important under the laws of this state, the State of Nevada, any sentence imposed by the jury may be refused by the State Board of Pardon commissioners.* Whatever sentence you return in your verdict this Court will impose that sentence. *Whether or not the State Board of Pardon commissioners, upon review, if requested by the defendant, would change that sentence, the Court has no way of knowing. Indeed, you don't either. The State Board of Pardon commissioners, however, would have the power to modify any sentence at a later date. And what that means is, let's say you fall — I am going to talk about his*

*defense. It was a fraud. And let's say you fall for that fraud and you say well, gee, I just can't bring myself to do what I should do, and I am going to impose life without parole. You don't die in prison of old age. People get out. Now, are you prepared to risk the life of some other person or child by giving him the opportunity to get out? That will be your risk. That will be your burden.*

*Statement #4: Never getting out. As the judge has instructed you, the pardons board has the ultimate authority to review any sentence, to pardon anybody. If you return a verdict of life without possibility of parole, I represent to you as a lawyer, as an attorney for the people of this county, that the pardons board has the authority to commute that tomorrow if they want to. They won't, of course, but they have the authority to. So don't buy that he is going to go to jail forever. It just doesn't happen.*

(Emphases added.)

In making these false, inflammatory statements, the prosecutor violated Sechrest's due process right to a fair trial.

**[14]** First, the prosecutor repeatedly misled the jurors by suggesting that a decision by the Board of Pardon Commissioners could (and likely would) free Sechrest if the jury did not return a verdict imposing the death sentence. The prosecutor claimed that the Board of Pardon Commissioners had the "ultimate authority" to commute a verdict of life in prison without the possibility of parole "tomorrow." The prosecutor told the jury, "You don't die in prison of old age. People get out." He then warned the jury not to "buy that [Sechrest] is going to jail forever. It just doesn't happen."[8]

---

[8]We note that the district court found that these false statements constituted error.

**[15]** The prosecutor's statement that no individual sentenced to life imprisonment "is going to go to jail forever. It just doesn't happen," is patently false. The prosecutor presented no evidence to back up this outlandish statement. Thus, this statement constituted improper testimony. *See, e.g., United States v. Morris*, 568 F.2d 396, 401 (5th Cir. 1978) (explaining that an attorney "may not inject into his argument any extrinsic or prejudicial matter that has no basis in the evidence" because such improper "testimony" will "increase the apparent probative force of [the attorney's argument] by virtue of his personal influence, his presumably superior knowledge of the facts and background of the case, and the influence of his official position.").

Moreover, the prosecutor's assertion that the actions of the Board of Pardon Commissioners could ultimately result in Sechrest's release was not true under existing Nevada law. When Sechrest was tried in 1983 for committing the two murders, the power of the Board of Pardon Commissioners to commute a sentence of life *without* the possibility of parole to a sentence of life *with* the possibility of parole was severely curtailed under Nevada Constitution Article 5, section 14(2).[9]

---

[9]In 1982, article 5, section 14(2) was added to the Nevada Constitution. Article 5, section 14(2) reads as follows:

> Except as may be provided by law, a sentence of death or a sentence of life imprisonment without possibility of parole may not be commuted to a sentence which would allow parole.

Thus, the plain language of Article 5, section 14(2)—in effect at the time of Sechrest's trial in 1983—indicates that the Board of Pardon Commissioners could not commute a sentence of life without the possibility of parole.

Despite this plain language, the Nevada Supreme Court held in 1990 that the Board of Pardon Commissioners *did* retain limited power to make such a commutation. *See Smith v. State*, 802 P.2d 628 (Nev. 1990). Though the decision in *Smith* was issued seven years after Sechrest's trial, it does not appear to announce "new" law. Rather, it appears that *Smith* merely clarified the law in effect at the time Article 5, section 14(2) was enacted in 1982.

Thus, the prosecutor's suggestion that the Board of Pardon Commissioners could easily commute a sentence of life imprisonment without the possibility of parole was false.

More importantly, Sechrest was on probation at the time he committed the two murders in 1983. Under Nevada law in effect at the time of Sechrest's offense (and still in effect today), an individual who is on probation at the time he commits another offense—here, the two murders—is not eligible for parole by the Parole Board on that offense. *See* Nev. Rev. Stat. § 213.1099(4)(e) ("NRS 213.1099(4)(e)") (prohibiting the reduction of a sentence to one allowing parole if the convicted individual had "[failed] in parole, probation, work release or similar programs"). The Nevada Supreme Court has held that NRS 213.1099(4)(e) applies even in situations where the Board of Pardon Commissioners commutes a sentence of life without the possibility of parole to a sentence allowing for parole. *See Smith v. State*, 802 P.2d 628, 630 (Nev. 1990) (explaining that while "the board of pardons retains the power to commute a sentence of life without the possibility of parole to a sentence allowing for parole," the "parole board [remains] subject to the restrictions of NRS 213.1099(4)(e)," and therefore cannot grant parole to those who were on probation at the time of their offenses, even if their sentences have been commuted by the Board of Pardon Commissioners).

**[16]** Thus, even if Sechrest had received sentences of life without the possibility of parole for the two murders, and the Board of Pardon Commissioners later commuted those sentences to life with the possibility of parole, the Parole Board would not have had the power to release Sechrest because he

---

For this reason, we cannot hold, as Sechrest argues, that the Board of Pardon Commissioners entirely lacked the power under the plain language of Article 5, section 14(2), to commute Sechrest's sentence at the time of his trial in 1983—although, as we next explain, it did lack that power for a different reason.

was on probation when he committed the two murders in 1983.[10] That was the law in Nevada at the time of Sechrest's trial, and it is the law that remains in effect today. Accordingly, contrary to the prosecutor's repeated assertions, the Board of Pardon Commissioners *did not* have the power to parole Sechrest.

The prosecutor compounded the damaging effect of his erroneous assertions by "representing" to the jury that "as a lawyer, as an attorney for the people of this county," "the pardons board has the authority to commute [a sentence of life without possibility of parole] tomorrow if they want to." As the Supreme Court has observed, a "prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 18-19 (1985). By vouching for the truthfulness of his *own* unsupported, inaccurate assertions, the prosecutor committed flagrant misconduct. *Cf. United States v. Molina*, 934 F.2d 1440, 1444-45 ("As a general rule, a prosecutor may not express . . . belief in the credibility of government witnesses. Such prosecutorial vouching, which consists of either placing the prestige of the government behind the witnesses through personal assurances of their veracity or suggesting that information not presented to the jury supports the witnesses' testimony, is improper.") (citation omitted).

Additionally, the prosecutor inflamed the passions of the jury by calling the defense a "fraud," and telling the jurors that if they "[fell] for that fraud," they would be "risk[ing] the life of some other person or child." The prosecutor told the jury, "[t]hat will be your risk. That will be your burden." We

---

[10]Though Sechrest presents his argument regarding NRS 213.1099(4)(e) for the first time on appeal, the district court addressed it *sua sponte* below. Because the district court decided the question on the merits, we may review it. *See Cadillac Fairview of Cal. Inc. v. United States*, 41 F.3d 562, 565 n.3 (9th Cir. 1994).

have held that similar inflammatory comments violate a criminal defendant's right to a fair trial. *See United States v. Sanchez*, 176 F.3d 1214, 1222 (9th Cir. 1999) (holding that the prosecutor committed misconduct "denigrating the defense as a sham"); *Kelly v. Stone*, 514 F.2d 18, 19 (9th Cir. 1975) (per curiam) (describing the prosecutor's statement that maybe next time the victim "will be someone you know" as "highly inflammatory and wholly impermissible").

In short, the prosecutor's statements were inflammatory, unsupported, and inaccurate. Significantly, neither defense counsel nor the trial judge did anything to stop the prosecutor from making these statements.[11]

To make matters worse, the trial judge gave the jury an instruction that increased the risk that the prosecutor's misconduct would affect the jury's verdict. In relevant part, the trial judge instructed the jury:

> Under the laws of the State of Nevada, any sentence imposed by the jury may be reviewed by the State Board of Pardon Commissioners. Whatever sentence you return in your verdict, this Court will impose that sentence. *Whether or not the State Board of Pardon Commissioners upon review, if requested by the defendant, would change that sentence, this Court*

---

[11]The State cites *Hall v. Whitley*, 935 F.2d 164, 165 (9th Cir. 1991) (per curiam) for the proposition that Sechrest's due process claim is procedurally barred under Nevada law from federal habeas review because defense counsel failed to object during voir dire and during closing argument to the prosecutor's misleading assertions. But the Nevada Supreme Court addressed Sechrest's due process claim on the merits, not treating it as procedurally barred, so we may do so as well. *See Wood v. Alaska*, 957 F.2d 1544, 1549 (9th Cir. 1992).

Additionally, as noted below, we hold that Sechrest's counsel provided him with ineffective assistance. It is therefore unsurprising that defense counsel failed to object to the prosecutor's blatantly inappropriate remarks.

*has no way of knowing. The State Board of Pardon*
*Commissioners, however, would have the power to*
*modify any sentence at a later date.*

(Emphasis added.)

Jury instructions that describe commutation may be appro-
priate where those instructions are accurate. *California v.*
*Ramos*, 463 U.S. 992, 1004 (1983). However, an instruction
that is accurate in the abstract can nonetheless violate the
Constitution if it inaccurately describes the possibility of
clemency on the facts of the defendant's case. *Coleman v.*
*Calderon*, 210 F.3d 1047, 1050-51 (9th Cir. 2000) (noting
that the prosecutor's argument on the necessity of imposing
a death sentence exacerbated the prejudice of a misleading
jury instruction on executive clemency); *Gallego v. McDan-*
*iel*, 124 F.3d 1065, 1074-77 (9th Cir. 1997) (finding that
Nevada's instruction on the possibility of executive clemency
was misleading because the defendant was under the sentence
of death in another jurisdiction, yet Nevada's instruction
implied that early parole was available for the defendant).
Furthermore, the need for accurate jury instructions is height-
ened where, as in this case, the prosecution argues the issue
of a defendant's future dangerousness. *E.g.*, S*immons v. South*
*Carolina*, 512 U.S. 154, 163-66 (1994) (explaining that inac-
curate instructions about parole eligibility may deprive a
defendant of due process when the defendant's future danger-
ousness is at issue).

Here, the jury instruction reinforced the prosecutor's argu-
ment that the Board of Pardon Commissioners was the entity
responsible for deciding Sechrest's term of imprisonment.
The jury instruction emphasized that the Board of Pardon
Commissioners had the "power to modify any sentence" and
that the court had "no way of knowing" whether the Board of
Pardon Commissioners would do so. When combined with
the prosecutor's assertion that "the pardons board has the ulti-
mate authority to review any sentence, to pardon anybody,"

the jury instruction contributed to the false impression that the Board of Pardon Commissioners could free Sechrest if he were not sentenced to death. Because the jury instruction invited the jury to accept the prosecutor's speculation "that the only way [the jury] could be assured [that Sechrest] would not be released would be to sentence him to death," it exacerbated, rather than corrected, the inaccurate effect of the prosecutor's arguments. *Coleman*, 210 F.3d at 1051.

**[17]** Bottom line: the prosecutor misled the jurors to believe that if they did not impose the death penalty, Sechrest could be released on parole and would kill again. In making his erroneous assertions, the prosecutor gave improper testimony, used his position as an attorney "for the people" to vouch for that improper testimony, and most likely inflamed the passions of the jury. The trial judge did nothing to stop the prosecutor from making these erroneous assertions. Instead, the trial judge gave a jury instruction that validated the prosecutor's false and inflammatory statements. In these circumstances, we conclude that the prosecutor committed misconduct rising to the level of constitutional error.

2.

We must now decide whether the constitutional error prejudiced Sechrest. Our prejudice inquiry focuses on the totality of the effect of the error. *Williams v. Taylor*, 529 U.S. 362, 398-99 (2000) (reviewing the "entire postconviction record" in conducting a prejudice inquiry). We review the "entire proceedings" to determine whether the prosecutor's misleading remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Hall*, 935 F.2d at 165 (quotation omitted). We hold that they did.

**[18]** A jury sitting in a capital case must be given a clear choice between the death penalty and a life sentence. *See Coleman v. Calderon*, 150 F.3d 1105, 1118 (9th Cir.), *rev'd on other grounds*, 525 U.S. 141 (1998) (noting "the Supreme

Court's emphasis on the importance of accuracy in the description of sentencing alternatives in a death penalty proceeding"). Here, the jury was not given that choice. The prosecutor repeatedly told the jury that Sechrest would be released if he did not receive the death penalty. The trial judge did nothing to stop the prosecutor from making this false representation, and gave a jury instruction that confirmed it. Finally, the prosecutor told the jurors that they would be "risk[ing] the life" of "some other child" if they did not sentence Sechrest to death. Accordingly, we hold that the prosecutor's misconduct, combined with the court's inaccurate jury instruction, had a substantial and injurious effect on the jury's decision to impose the death penalty on Sechrest.

[19] Though the prosecutor's misconduct alone justifies this holding, we note that Dr. Gerow's testimony exacerbated the prejudicial effect of the prosecutor's remarks.[12] Dr. Gerow was the prosecution's primary penalty phase witness. After stating that he had examined Sechrest at *defense* counsel's request, Dr. Gerow testified that Sechrest had an extensive criminal history that included burglary, possession of stolen property, and possession of narcotics. Dr. Gerow further testified that Sechrest had a "callous disregard for human life" and was an incurable sociopath who, if released, would pose a danger to others, particularly to little girls. Dr. Gerow's testimony that Sechrest was extremely dangerous and could not be rehabilitated likely had a substantial influence on the jury's decision to sentence Sechrest to death.

---

[12]Like the district court, we recognize the "interplay" between Sechrest's due process claim and his ineffective assistance of counsel claim concerning the admission of Dr. Gerow's testimony. As discussed below, we hold that Sechrest's counsel provided him with ineffective assistance by allowing the State to call Dr. Gerow as a penalty phase witness. We note, however, that even if counsel's performance was *not* ineffective in this regard, we would still consider the impact of Dr. Gerow's damaging testimony in examining the entire proceedings to determine the totality of the effect of the prosecutor's misleading and inflammatory argument.

**[20]** In reaching this conclusion, we depart from the state post-conviction court's and the district court's analysis of Dr. Gerow's testimony. Both courts theorized that Dr. Gerow's testimony, though extremely harmful to Sechrest, was "cumulative," putting nothing new before the jurors that they did not already know. In so theorizing, both courts neglected to recognize the significance of Dr. Gerow's role as a mental health expert. As the Supreme Court has explained:

> [P]sychiatrists gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury; they analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder or behavior; and they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question. . . . Unlike lay witnesses, who merely describe symptoms they believe might be relevant to the defendant's mental state, psychiatrists can identify the "elusive and often deceptive" symptoms of insanity, and tell the jury why their observations are relevant. Further, where permitted by evidentiary rules, psychiatrists can translate a medical diagnosis into language that will assist the trier of fact, and therefore offer evidence in a form that has meaning for the task at hand. Through this process of investigation, interpretation, and testimony, psychiatrists ideally assist lay jurors, who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense.

*Ake v. Oklahoma*, 470 U.S. 68, 80-81 (1985) (citations omitted). Dr. Gerow's testimony cannot be considered merely "cumulative" because of his role as the only medical doctor to discuss Sechrest's criminal past and pathology during the pen-

alty phase. While other lay witnesses may have touched on some of the same points that were presented by Dr. Gerow, only Dr. Gerow had the education and experience necessary to evaluate Sechrest's dangerousness. Thus, his opinion carried more credibility. Dr. Gerow's connection with the defense, and his inability to say anything positive or even mitigating about Sechrest, meant that the prosecutor's misleading remarks and the erroneous jury instruction likely had particular impact on the jury.

The State contends that the prosecutor's misconduct did not directly relate to one of the statutory aggravating and mitigating factors presented to the jury, and therefore played no role in the jury's sentencing decision. The State's contention is misguided: the question of prejudice focuses on the totality of the effect of the error, *Williams*, 529 U.S. at 398, not whether the error relates directly to an aggravating or mitigating factor. Moreover, under Nevada law, the jury has the power to impose a sentence less than death regardless of the weight of aggravation or the total lack of mitigation. *Evans v. State*, 28 P.3d 498, 515 (Nev. 2002); *Bennett v. State*, 787 P.2d 797, 803 (Nev. 1990), *overruled on other grounds by Leslie v. Warden*, 59 P.3d 440 (Nev. 2002). Accordingly, the fact that the prosecutor's arguments did not directly relate to an aggravating factor is not determinative of our prejudice inquiry.[13]

Furthermore, the only mitigating factor offered by the defense—Sechrest's lack of a violent criminal past, with the

_____

[13]In addition, we have already explained that three of the four aggravating factors have since been held unconstitutional. *Supra* at 15993. Thus, it is virtually certain that on remand, the district court will strike some, if not all, of the aggravating factors as invalid. Although we do not consider the invalidity of those aggravating factors as part of our prejudice analysis, we note that the aggravating factors undoubtedly had a substantial and injurious effect on the jury's imposition of the death penalty. Indeed, as the district court conceded, "the most important considerations informing the sentencing decision must have been the aggravating circumstances relating to the nature of the crimes."

implication that he was unlikely to be dangerous in prison—*was* in fact affected by the prosecutor's misconduct. The prosecutor argued and improperly vouched that Sechrest would be released and would kill again if he was not sentenced to death. The jury was more likely to believe that argument after hearing Dr. Gerow testify that Sechrest had an extensive criminal history and was an "incurable sociopath" who posed a danger to little girls.

Finally, the State argues that because Sechrest's crime was one "of utter depravity—unthinkable by most people in the abstract," we would "demean both *Brecht* and the jury that sentenced Sechrest to death" if we held that the constitutional violation prejudiced Sechrest. This argument, however, is analogous to the argument that the Supreme Court condemned in *Godfrey v. Georgia*, 446 U.S. 420 (1980). In *Godfrey*, the Supreme Court reviewed an affirmation of a death sentence "based upon no more than a finding that the offense was 'outrageously or wantonly vile, horrible and inhuman.' " 446 U.S. at 428. The Supreme Court reversed, reasoning that "[t]here is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence. A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.' " *Id.* at 428-29.

In short, all first degree murders can be described as "unthinkable." Merely labeling them as such does not mean that all jurors will find that they warrant the death penalty, nor does the label relieve us of our duty to determine whether the constitutional errors that occurred in this case deprived Sechrest of a fair trial.

**[21]** We conclude that, when viewed against the background of the entire proceedings, including Dr. Gerow's testimony and the misleading jury instruction, the prosecutor's erroneous and inflammatory assertions had a substantial and injurious effect in determining the jury's sentencing verdict.

Because Sechrest was deprived of his due process right to a fair penalty phase trial, he must be resentenced.

## B.

Next, Sechrest argues that his trial counsel provided him with ineffective assistance by allowing the prosecution to call Dr. Gerow as a penalty phase witness. We address this issue because it is connected to and throws additional light on the prosecutorial misconduct question, and because it may be pertinent if the penalty phase is retried. We emphasize, however, that our prosecutorial misconduct ruling is an independent basis for reversing the penalty phase judgment.

A defendant's Sixth Amendment right to representation in a criminal trial includes the right to effective assistance of counsel. *Duncan v. Ornoski*, 528 F.3d 1222, 1233 (9th Cir. 2008). Claims of ineffective assistance of counsel are mixed questions of law and fact which we review de novo. *Beardslee v. Woodford*, 358 F.3d 560, 569 (9th Cir. 2004). Though state court findings of fact are entitled to deference, we reserve the right to give different legal weight to such facts. *See Reiger v. Christensen*, 789 F.2d 1425, 1428 (9th Cir. 1986).

To succeed on his ineffective assistance of counsel claim, Sechrest must show that (1) his trial counsel's performance "fell below an objective standard of reasonableness" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).[14]

We hold that Sechrest has met both *Strickland* require-

---

[14]The requirements of *Strickland* apply to sentencing. *See Gardner v. Florida*, 430 U.S. 349, 358 (1977).

ments. He is entitled to resentencing on this alternative
ground for relief.

1.

Under *Strickland*, counsel's competence is presumed. *Id.* at
689. To rebut this presumption, Sechrest must demonstrate
that his counsel's performance was unreasonable under pre-
vailing professional norms and was not the product of sound
strategy. *Id.* at 688-89. We consider counsel's performance
deficient if it falls outside the range of competence demanded
of attorneys in criminal cases. *Turner v. Calderon*, 281 F.3d
851, 879 (9th Cir. 2002).

Here, for three main reasons, we hold that counsel's repre-
sentation of Sechrest fell far outside the range of competence
demanded of an attorney representing a criminal defendant
who is facing the death penalty.

**[22]** First, counsel should not have allowed the prosecution
to review Dr. Gerow's confidential report on Sechrest's men-
tal health. Dr. Gerow evaluated Sechrest two months before
trial at defense counsel's request. After reviewing Dr.
Gerow's report and discussing it with Dr. Gerow, Sechrest's
counsel decided not to call Dr. Gerow as witness for the
defense. Inexplicably, however, counsel disclosed Dr.
Gerow's confidential and privileged report to the prosecution.
The report contained information about Sechrest's criminal
history and his upbringing that Sechrest had revealed only to
Dr. Gerow. The report also contained Dr. Gerow's diagnosis
that Sechrest had a "polymorphous perversion."

Without Dr. Gerow's report, the prosecution would not
have had access to this privileged information. More impor-
tantly, defense counsel had absolutely no obligation to dis-
close Dr. Gerow's confidential report to the prosecution. By
allowing the prosecution to review and introduce into evi-

dence Dr. Gerow's report on Sechrest, defense counsel performed deficiently.

**[23]** Second, Sechrest's counsel should not have stipulated to the prosecutor calling Dr. Gerow *as a witness for the prosecution*. Counsel's decision to so stipulate is indefensible. This decision put counsel in the difficult position of having to cross-examine the only mental health expert to testify during the penalty phase of Sechrest's trial, even though counsel himself had chosen Gerow and supplied him with information about Sechrest. Furthermore, the jury was told that Dr. Gerow was hired by the *defense* to examine Sechrest and report on his mental health. Given that the defense's expert not only had nothing favorable to say about Sechrest, but thought that he was beyond all hope of rehabilitation, the jurors had even less incentive to impose a sentence that they were told by the prosecutor and the court might lead to Sechrest's eventual release.

At the November 8, 1990 state court evidentiary hearing on this issue, Sechrest's counsel took the stand and testified that he did not object to the prosecutor calling Dr. Gerow as a witness because counsel believed that Dr. Gerow would provide helpful information about Sechrest's troubled background. This explanation does not indicate a sound strategic decision. *Strickland*, 466 U.S. at 688-89. If counsel truly believed that Dr. Gerow's testimony would be helpful, the appropriate "strategic decision" would have been to call Dr. Gerow to testify on behalf of the defense. Instead, counsel did just the opposite. Furthermore, counsel did not pursue or argue any mitigating factors related to Sechrest's troubled background. Given these considerations, counsel cannot hide behind a later, implausible assertion that his decision was "tactical" given that his actions show that he had no intention of presenting any mitigating evidence based on Sechrest's mental health.[15]

---

[15]We are aware that the district court found that counsel's decision to allow the prosecution to call Dr. Gerow to the stand was "made with the

**[24]** Third, counsel's level of preparation for Dr. Gerow's testimony fell far below an objective standard of reasonableness. Once counsel decided to allow the prosecution to call Dr. Gerow as a witness, counsel had a duty to prepare for Dr. Gerow's testimony. "Preparing for the penalty phase of a capital trial is the equivalent of preparing for an entirely new trial, and trial counsel must treat it as such." *Turner*, 281 F.3d at 891. Here, counsel did not speak with Dr. Gerow after agreeing to let him testify for the prosecution. Counsel's lack of preparation for Dr. Gerow's testimony is evident from counsel's lackluster performance at trial. During his cross-examination of Dr. Gerow, counsel asked several questions about whether Sechrest could be cured and whether counseling could help Sechrest. In response, Dr. Gerow described any such efforts as "absolutely fruitless" and stated that Sechrest's case was a hopeless one.

In sum, some of the most damaging testimony presented during the penalty phase of trial was elicited by Sechrest's own counsel, from a witness Sechrest's counsel had originally selected and could have prevented from testifying. Indeed, as the state post-conviction court observed, "the 'balance' of Dr. Gerow's testimony [did] not favor Mr. Sechrest. It favor[ed] the State." Unsurprisingly, Sechrest's counsel admitted at the state court evidentiary hearing that Dr. Gerow's testimony was damaging and that counsel was unhappy with it. Had counsel adequately prepared for his cross-examination of Dr. Gerow, he would not have asked questions that elicited such negative answers.

**[25]** For the foregoing reasons, we conclude that counsel's performance was deficient under prevailing professional

---

benefit of adequate information." The district court's finding, however, is not supported by the record. Though the district court found that counsel talked to Dr. Gerow on "at least three occasions," the record reflects that each of these conversations occurred nearly two months *before* counsel decided to allow the prosecution to call Dr. Gerow as its witness.

norms and was not the product of sound strategy. Our conclusion comports with that of the Nevada state post-conviction court—the only court to conduct an evidentiary hearing on this issue.

2.

**[26]** Because we have determined that counsel's performance was deficient, we must now decide whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. It is clear that, if Sechrest's counsel had performed competently, Dr. Gerow would not have been allowed to testify for the prosecution. Further, we have already found that Dr. Gerow's testimony, when considered in the context of the trial as a whole, likely played an important role in the jury's verdict imposing the death penalty. Accordingly, we conclude that Sechrest has satisfied the prejudice prong of *Strickland*. He is entitled to resentencing.[16]

## CONCLUSION

With respect to the penalty phase, we hold that Sechrest's Sixth and Fourteenth Amendment right to a fair trial was violated by the prosecutor's gross misconduct. We also hold that Sechrest's Sixth Amendment right to effective assistance of counsel was violated when his trial attorney allowed Dr. Gerow to testify for the prosecution. Because we do not find either of these constitutional violations harmless, we reverse the district court as to Sechrest's sentence.

With respect to the guilt phase, we hold that Sechrest's *Miranda* rights were not violated, and affirm the district court on this ground. We also hold, however, that Sechrest's previ-

---

[16]Because we conclude that Sechrest is constitutionally entitled to resentencing for two reasons, we do not address the contention that Dr. Gerow's testimony violates Sechrest's Fifth Amendment rights.

ously defaulted claims—which include both guilt and penalty phase claims—should not have been barred from federal habeas review. We remand these claims to the district court for appropriate consideration.

Should the district court deny or dismiss Sechrest's guilt phase claims after appropriate and timely consideration, we instruct the district court to issue a writ of habeas corpus as to the death sentences unless, within a reasonable time, the State grants a new penalty phase trial or imposes a lesser sentence consistent with the law. We also instruct the district court to order Sechrest removed from death row during the pendency of the proceedings. Finally, we instruct the district court to order any other interim relief that it deems appropriate.

**AFFIRMED in part, REVERSED in part, and REMANDED for proceedings consistent with this opinion.**