**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

TRACY PETROCELLI,
*Petitioner-Appellant*,

v.

RENEE BAKER, Warden,
*Respondent-Appellee.*

No. 14-99006

D.C. No.
3:94-cv-00459-RCJ

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, Senior District Judge, Presiding

Argued and Submitted September 16, 2016
San Francisco, California

Filed July 5, 2017

Before: William A. Fletcher, Morgan Christen,
and Michelle T. Friedland, Circuit Judges.

Opinion by Judge W. Fletcher;
Concurrence by Judge Christen

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Tracy Petrocelli's pre-AEDPA habeas corpus petition with respect to his Nevada state conviction for robbery and first-degree murder, and reversed the denial of the petition with respect to his death sentence.

The panel held that because Petrocelli failed to invoke his right to counsel unambiguously, his April 19 interrogation was not conducted in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), or *Edwards v. Arizona*, 451 U.S. 477 (1981), and trial counsel was therefore not ineffective in failing to move to suppress testimony as fruit of the interrogation.

The panel rejected Petrocelli's contention that use at trial of his statements to detectives on April 20 and 27 violated his Fifth, Sixth, and Fourteenth Amendment rights. Because the State used the statements only for impeachment, the panel rejected Petrocelli's contention that his Fifth and Sixth Amendment rights were violated by the taking of his statements during interrogations at which his appointed counsel was not present. The panel rejected the defendant's contention that his statements were involuntary.

The panel affirmed the district court's conclusion that Petrocelli failed to exhaust his challenge to the jury instruction defining premeditation and deliberation.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the State waived any defense to Petrocelli's contention that the admission of psychiatric testimony during the penalty phase violated his Fifth and Sixth Amendment rights under *Estelle v. Smith*, 451 U.S. 454 (1981). The panel held that even if the State had not waived its defense, admission of the testimony violated *Estelle*, where the psychiatrist, acting at the request of the prosecutor, visited Petrocelli in jail to determine his competency to stand trial, failed to provide *Miranda* warnings, did not seek or obtain permission from Petrocelli's appointed counsel to visit or evaluate him, and testified that Petrocelli was dangerous and incurable. The panel concluded that the violation had a substantial and injurious effect on the jury's decision to impose the death sentence.

Concurring, Judge Christen wrote separately because, in her view, even if the State could show that the prosecutor's tactics had not prejudiced the jury's verdict, Petrocelli's case is one of the very few in which deliberate prosecutorial misconduct and egregious trial errors warrant habeas relief.

---

## COUNSEL

A. Richard Ellis (argued), Mill Valley, California, for Petitioner-Appellant.

Robert E. Wieland (argued), Senior Deputy Attorney General; Adam Paul Laxalt, Attorney General; Office of the Attorney General, Carson City, Nevada; for Respondent-Appellee.

## OPINION

W. FLETCHER, Circuit Judge:

In 1982, Tracy Petrocelli was convicted and sentenced to death in Nevada state court for the robbery and first-degree murder of James Wilson, a Nevada used car salesman. Petrocelli filed a federal petition for writ of habeas corpus before the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Petrocelli appeals the district court's denial of the writ.

We affirm the district court's denial of the writ with respect to Petrocelli's conviction but reverse with respect to his death sentence. We hold that admission of Dr. Lynn Gerow's psychiatric testimony during the penalty phase violated Petrocelli's Fifth and Sixth Amendment rights under *Estelle v. Smith*, 451 U.S. 454 (1981), and that the violation had a substantial and injurious effect on the jury's decision to impose the death sentence. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

## I. Background

### A. Crime, Arrest, and Pre-Trial Interrogations

On March 29, 1982, Petrocelli went on a test drive of a Volkswagen pickup truck with James Wilson, a used car salesman, in Reno, Nevada. At some point during that test drive, Petrocelli shot and killed Wilson. Wilson's body was found buried in a crevice under some rocks and brush near Pyramid Lake. The lake is about thirty-five miles north of Reno. Wilson had been shot in the neck, chest, and back of the head.

Nearly a year before killing Wilson, in May 1981, Petrocelli had pleaded guilty in Washington State to kidnaping his girlfriend, Melanie Barker. He had received a suspended sentence conditioned on his completion of a drug treatment program. Petrocelli absconded from the treatment program twice and never completed it. Petrocelli shot and killed Barker in Washington State in October 1981, five months before he killed Wilson in Nevada.

Petrocelli was arrested for the Wilson murder in Las Vegas on April 18, 1982. The following day, he was interrogated in Las Vegas. Petrocelli was advised of his *Miranda* rights, and he signed a statement indicating that he understood them. Petrocelli stated during the interrogation, "I'd sort of like to know what my . . . lawyer wants me to do." (Ellipsis in original.) He nonetheless continued to answer questions. Later in the interrogation, he admitted to having previously stolen a car from a "Dub Peterson" dealership in Oklahoma City after taking it for a test drive with a salesman.

Petrocelli was subsequently transported to Reno. On the afternoon of April 20, he was interrogated by Sergeants Glen Barnes and Abel Dickson, as well as two prosecutors from the District Attorney's Office of Washoe County, Bruce Laxalt and Don Nomura. At the beginning of the interrogation, Petrocelli made a variety of requests that he characterized as "preconditions" to talking. They included locating some of his property, facilitating a visit by his wife, bringing him photographs of Barker, arranging a television interview, and receiving psychiatric counseling. Dickson testified at a hearing outside the presence of the jury that no promises were made, but that Petrocelli was told that if his requests "could be done they would be done." After being

informed of his *Miranda* rights, Petrocelli confessed to shooting both Wilson and Barker.

On April 20, the Public Defender of Washoe County was appointed as counsel for Petrocelli by order of the Reno Justice Court. On April 21, Petrocelli personally appeared in the Justice Court, where he was arraigned and bail was set.

The visitors' log for the Washoe County Jail shows that Larry Wishart, an attorney from the Washoe County Public Defender's Office, and Tim Ford, an investigator from that office, visited Petrocelli on April 21, the day of his arraignment, at about 1:50 pm. (A date and time stamp of "82 APR 21 P 1 :5" appears on the photocopy of the log. The number specifying the minute is cut off on the photocopy in the trial court record.) A date and time stamp shows that their visit lasted about half an hour ("82 APR 21 2 :2"). The log shows a visit from Dr. Lynn Gerow later that day. Gerow was a psychiatrist who had been asked by Chief Deputy District Attorney Laxalt to evaluate Petrocelli's competency to stand trial.

The relevant page of the visitors' log is dedicated exclusively to visitors to Petrocelli. Wishart and Ford's entry, with their signatures, is on line three of the page. They wrote "WCPD/ATT" in the box asking for their "relationship." Dr. Gerow's entry, with his signature, is on line four, immediately below. He wrote "D.A." in the box asking for his "relationship." The entry by Wishart and Ford, stating their relationship to Petrocelli, would have been apparent to Gerow when he signed the log. A date and time stamp show that Gerow signed in at about 3:50 ("82 APR 21 P 3 :5"). There is no stamp showing when his visit ended.

Gerow testified at trial that he spent two hours interviewing Petrocelli.

Petrocelli testified that he believed that Dr. Gerow had come to see him in response to his request for counseling. During his April 20 interview in Reno, Petrocelli had specified as one of his "preconditions" that he receive psychiatric counseling. Petrocelli testified consistently at a hearing outside the presence of the jury, saying that he had stated as one of his preconditions: "I wanted to have psychiatric counseling while I was in the jail." He testified that he "saw a doctor Gerow once." When asked how long he spoke to Gerow, Petrocelli responded, "[I]t didn't seem like it was very long." When asked to estimate the time, Petrocelli responded, "Well, I never did even finish my conversation. He just cut me off in the middle and left."

On April 27, Dr. Gerow sent a letter labeled "confidential" to Prosecutor Laxalt in the District Attorney's office. He wrote:

> At your request I examined Mr. Maida [the name under which Petrocelli was then being held] at the Washoe County Jail on April 21, 1982. I had an opportunity to discuss his case with you prior to the psychiatric evaluation.
>
> . . .
>
> Mr. Maida was abused as a child. He was adopted at three years of age. . . . He was in trouble at school and home at an early age. He developed a psychopathic personality

> which is complicated by a history of severe drug abuse. . . .
>
> In my opinion Mr. Maida is both competent for understanding the charges and assisting his attorney and responsible (mens rea) for any alleged offense.
>
> I have determined to see Mr. Maida in the future on an "as needed" basis. If you require my involvement as circumstances develop, please feel free to call me.

Gerow testified in state post-conviction proceedings that when he wrote "as needed," he meant "as needed by Mr. Laxalt."

Wishart testified in state post-conviction proceedings that when he met with Petrocelli on April 21, he did not know that Dr. Gerow was going to see his client later that afternoon. Wishart testified that he would not have employed Gerow because he "had a prosecution bias."

Petrocelli was interrogated again on April 27. After being advised of his *Miranda* rights, Petrocelli made another statement.

### B. Guilt Phase Trial

On April 28, 1982, Petrocelli was indicted on one count of robbery with a deadly weapon and one count of first-degree murder. The guilt phase of the trial began on July 27, 1982, and ran through August 5, 1982. At trial, the State contended in support of the robbery count that Petrocelli went

on the test drive with Wilson in order to steal the truck, that he used his gun to try to force Wilson out of the truck, and that he shot Wilson when Wilson would not cooperate. To bolster its theory, the State called Melvin Powell, an Oklahoma car salesman, to testify that Petrocelli had stolen a car in a similar manner (though without injuring Powell) during a test drive in February 1982.

The defense contended, based on Petrocelli's testimony at trial, that Petrocelli had been a *bona fide* prospective purchaser with no intent to steal, and that Wilson was accidentally shot in the midst of a heated argument and struggle that resulted from haggling over the price of the truck. To impeach Petrocelli's testimony, the State introduced portions of the statements that Petrocelli had made on April 20 and 27. To undermine Petrocelli's contention that the Wilson shooting was unintentional, the State impeached Petrocelli with his statement on April 20 that his earlier shooting of his girlfriend, Melanie Barker, was an "accident." The prosecutor also impeached Petrocelli by confronting him with other inconsistencies between his trial testimony and his statements to the detectives.

The jury found Petrocelli guilty of both charges.

## C.  Penalty Phase Trial

### 1.  Aggravating Factors and Lay Testimony

In order to render Petrocelli death-eligible, the State had to establish at least one aggravating factor. During the penalty phase of Petrocelli's trial, the State sought to establish two such factors:  (1) that the murder had been committed in the course of a robbery, and (2) that Petrocelli

had previously been convicted of a violent felony, the kidnaping of his girlfriend Melanie Barker. (The first factor was later held by the Nevada Supreme Court to be invalid. *See McConnell v. State*, 102 P.3d 606, 624 (Nev. 2004) (per curiam). In reviewing Petrocelli's third petition for post-conviction relief, the Nevada Supreme Court held that use of this factor had been improper.)

To establish the first factor, Prosecutor Laxalt put John Lucas on the stand. Lucas had been in the Washoe County Jail with Petrocelli for about five weeks after Petrocelli's arrest for the Wilson murder. Lucas testified that Petrocelli had told him that he had shot Wilson in order to steal the truck. He also testified that Petrocelli said he was "going to get rid of" the district attorney as well as an unidentified woman Petrocelli characterized as a "snitch."

The second factor was Petrocelli's conviction for kidnaping Barker. At trial, it was uncontested that he had later killed her. However, at the time of trial he had not been convicted of the killing. To establish the second factor, Prosecutor Laxalt called Melanie Barker's mother, Maureen Lawler, to testify about the circumstances that had led to the kidnaping. The jury had already learned during the guilt phase, from Petrocelli's testimony and from the testimony of an eye-witness, that Petrocelli had killed Barker. Lawler testified only as to the circumstances that had led to the kidnaping conviction. Lawler, who had lived with her daughter in the city of Kent, in western Washington, testified that Barker had gone to eastern Washington with Petrocelli for three days, that Barker had been "beaten on the face" and was "hysterical" when she returned home, and that at some point during the three days Barker had been told by Petrocelli that his friends would "do away with her." Lawler testified

that after Barker had told Petrocelli that her mother would have the police looking for her, "He agreed to take her back. . . . At that point, she got away from him." Lawler also described a phone conversation, prior to the kidnaping, when Lawler had arranged for Petrocelli's wallet to be taken to the police station. Petrocelli objected to her having done so, and she testified that Petrocelli said he "would blow me away." Laxalt also called Joan Bleeker, who testified that Barker had come into a restroom during the time she was in eastern Washington and had asked Bleeker to call the police because she was being kidnaped.

Petrocelli testified, presenting his version of what had happened during the three days in eastern Washington in an attempt to show, despite his conviction, that he had not really kidnaped Barker. According to Petrocelli, Barker went with him voluntarily; they were accompanied by a friend of Petrocelli; they went out in public, eating in restaurants and going to stores together; and she and Petrocelli got in a fight as they were driving back to western Washington.

In the interval between the testimonies of Lawler and Bleeker, Prosecutor Laxalt played a tape recording of a portion of Petrocelli's interrogation on April 20 in which Petrocelli described the Wilson killing. Petrocelli had cried during his in-court testimony when describing the Wilson killing. The tape recording is not in the record, but it is apparent from the transcript that Laxalt played the tape to contrast Petrocelli's tearful demeanor during trial to an unemotional demeanor on April 20.

2.  Professional Mental Health Evidence

Defense counsel Wishart submitted written reports by three different mental health professionals—Dr. John Petrich, a psychiatrist; Dr. Martin Gutride, a psychologist; and Dr. John Chappel, a psychiatrist. Wishart called none of the three to give live testimony.

Dr. Petrich's evaluation of Petrocelli's mental health and future dangerousness was the most favorable to Petrocelli, but his evaluation was of limited use to the defense. Petrich had evaluated Petrocelli in June 1981, when Petrocelli was in jail in Washington State on the kidnaping charge, prior to killing Barker and Wilson.

Drs. Gutride and Chappel evaluated Petrocelli in July 1982, after he had killed Barker and while he was in jail waiting to stand trial for killing Wilson. Gutride reported that Petrocelli was adopted at age two and a half, and had been physically abused by his biological mother. Petrocelli's adoptive mother died when Petrocelli was seventeen, and Petrocelli attempted suicide several months after the funeral. After his adoptive mother's death, he became close to his adoptive father for a brief time, but fell out of touch after his father remarried. Gutride reported that Petrocelli cried when he spoke about having lost contact with his father. Petrocelli was "placed in a military academy at age twelve because of discipline problems," and he joined the Marines at about age seventeen. While in the Marines, Petrocelli was arrested for fighting with policemen while drunk; shortly thereafter, he began going AWOL. He was eventually given a dishonorable discharge. Sometime around 1974, Petrocelli moved to Washington State, began working in a steel mill, and became, by his own admission, "increasingly unstable." In 1976, he

attempted suicide.  In 1977, he was arrested for theft but fled before his trial.  He became a professional gambler in Reno, Nevada, and began abusing alcohol and drugs.  He was arrested in 1980 for kidnaping Barker.

Dr. Gutride reported that Petrocelli "cried openly" during the interview and that his "distraught behavior had the quality of his practically begging for help."  "[H]e desperately wants to know what is the matter with him and why he did the things he is charged with.  He doesn't deny responsibility, but says he can't remember most of the circumstances surrounding the various crimes."  According to Gutride, Petrocelli told him he "ha[d] called crisis lines in every city, but been unable to get any help" and "ha[d] talked with psychiatrists while in other jails and been put off."

Dr. Gutride reported that throughout the interview, Petrocelli's "thought processes were logical and coherent, memory seemed good, but selective, and intelligence seemed quite adequate."  However, "[o]nce formal testing began, the client seemed to lose those qualities.  The difference was so striking that he appeared to be faking 'bad.'"  Gutride concluded that Petrocelli was "clearly a lot brighter than his test scores reflect."

Dr. Gutride concluded that Petrocelli is "very impulsive," has "a high potential for violence," is "very mistrustful of others," and may be "a relatively high suicide risk."  Gutride diagnosed Petrocelli with "antisocial personality with paranoid features."  He noted that "[t]he personal distress he exhibited during the interview seems genuine and the client may truly desire some mental health treatment," though his "ability to profit from such treatment is questionable" because of his distrust of others.  Gutride concluded by noting

that Petrocelli "can be quite dangerous to others as well as himself and treatment should be offered in a setting where the client can be closely monitored."

Dr. Chappel reported some of the same family background information that Dr. Gutride reported. Chappel further reported that Petrocelli's arrest for kidnaping was "very traumatic" for him. Petrocelli "repeatedly asked for help" while in jail in Seattle, was seen by Dr. Petrich, and was put on an antipsychotic drug that helped him sleep. Petrocelli apparently attempted to commit suicide shortly afterwards, and was put in solitary confinement as a result. Chappel reported that Petrocelli "viewed the experience as one of asking for help and not getting it." He recounted Petrocelli's description of shooting Barker. Petrocelli asserted that "there were times when a 'black box' of control in his head opened and a voice or an impulse told him to kill or do some other destructive act," but that he still did not "understand why his girlfriend had to die." Petrocelli "expresse[d] a wish for further evaluation or treatment so he [could] find out whether or not he killed on purpose."

Dr. Chappel concluded that Petrocelli was both "depressed and angry," with the depression "expressed through sobbing and tears," as well as various suicide attempts. His anger was directed "primarily at the police and the district attorneys." "He considers the Washoe County District Attorney as premeditating his murder. When this rage occurs [he] threatens to kill the prosecutor." Chappel diagnosed Petrocelli with impulse control disorder and antisocial personality disorder. He wrote that "a more extensive evaluation" would be useful in order for Petrocelli "to have a better understanding of the reasons for his loss of impulse control and his reason for killing someone who was

close to him." Chappel observed that if Petrocelli were "not sentenced to death and executed . . . in his current state of mind he is very dangerous to those people to whom his rage is directed. A period of evaluation and a trial of treatment might serve a useful purpose in preventing any further homicidal outbursts of rage on his part."

After these three written reports were admitted into evidence, Prosecutor Laxalt called Dr. Gutride to the stand. Gutride's testimony was very short, filling just under two pages of transcript. In an attempt to undermine Gutride's diagnosis and the portions of his report that were favorable to Petrocelli, Laxalt drew Gutride's attention to his conclusion that Petrocelli had been "faking 'bad.'" Laxalt asked Gutride, "Despite the faking on the IQ test, et cetera, do you think this is a valid diagnosis?" Gutride replied that he could substantiate his diagnosis of "unsocial with paranoid tendencies" with a "long history." Gutride stated that the diagnosis "does not imply an individual is unable to think properly or conduct themselves conventionally. It relates mostly to a style of living."

Prosecutor Laxalt then called Dr. Gerow to the stand. Defense counsel Wishart objected on the grounds of psychiatrist-patient privilege, but the court overruled the objection. Laxalt introduced no written report by Gerow. Gerow testified that he had interviewed Petrocelli for two hours on April 21, and that as a result of his interview he had formed an opinion of Petrocelli's "mental and emotional personality traits." Gerow said that he agreed with Drs. Chappel and Gutride's diagnosis of "antisocial personality." However, Gerow referred to it as a "psychopathic" rather than an "antisocial" personality. Gerow described Petrocelli's personality as "rare," and as the personality of someone "who

is very callous and selfish, someone unreliable and irresponsible." He testified that individuals with psychopathic personalities "are repeatedly in trouble with the law," because they "don't believe in the rules that society set up" and do not learn from punishment. He testified that "[t]here is no treatment at all" for psychopathic personality, that the condition worsens during adolescent years, and that it "persists throughout life." Gerow testified that the violence potential of a psychopathic "varies," but that the propensity for further violence is "quite high" for individuals with a history of violence. Gerow testified that being "a psychopathic" was an incurable "emotional disturbance." Gerow concluded his direct examination testimony by stating unequivocally, "There is no cure."

### 3. Jury Instructions, Final Argument, and Verdict

Before final penalty-phase arguments, the judge instructed the jury. Jury Instruction 5 provided, "If the penalty is fixed at life imprisonment without the possibility of parole, the defendant shall not be eligible for parole." However, the instruction continued, indicating that the State Board of Pardon Commissioners had the power to release Petrocelli from prison even if the jury returned a sentence of life imprisonment without parole:

> Under the laws of the State of Nevada, any sentence imposed by the jury may be reviewed by the State Board of Pardon Commissioners. Whatever sentence you return in your verdict, this Court will impose that sentence. Whether or not the State Board of Pardon Commissioners upon review, if requested by the defendant, would change that

sentence, this Court has no way of knowing. The State Board of Pardon Commissioners, however, would have the power to modify any sentence at a later date.

In his closing argument, Prosecutor Laxalt emphasized Dr. Gerow's testimony, Petrocelli's incurability, and the possibility that the Board of Pardon Commissioners could release Petrocelli from prison. Laxalt maintained that Petrocelli "is, has been, and will forever remain a cool unfeeling, callous, individual, and a cold-blooded thief and killer." "He will never change." He continued, "Dr. Gerow has said there is no treatment; he will be a psychopathic personality, unfortunately." "Extreme mental or emotional disturbance" cannot be a mitigating circumstance because such disturbance implies that "there is treatment available for this person. What psychopath means, essentially, is a mean, bad person who has never changed and who will continue to victimize." "[N]o society, no community, no county, no city, no state, should ever have to risk again Tracy Petrocelli on the street."

In his rebuttal argument, Prosecutor Laxalt pointed to the reports of Drs. Chappel and Gutride, noting that each had discussed the possibility of treatment: "That a period of evaluation and a time of treatment might serve a reasonable purpose. . . . Do we take that chance?" He answered this question by emphasizing Dr. Gerow's testimony. "[H]e will not learn from punishment. He will not learn, he cannot learn." Invoking the possibility of Petrocelli's release from prison, Laxalt concluded:

I ask you to consider years down the road when the decisions are being made at the

Pardons Board and the Parole Board and we have all gone our separate ways and Mr. Petrocelli is there, the sole person applying for the pardon or applying for parole crying tears of remorse and telling the people how it wasn't he who was the murderer of Mr. Wilson it was an accident and he got railroaded, and telling people that it wasn't he who was the murderer of Melanie it was an accident, and he was railroaded. . . . Because he will be there. He will be there. . . . That's a sad fact, but it's to be faced.

Laxalt asked that the jury "return a verdict of death for Mr. Tracy Petrocelli, a cold-blooded killer, who will always remain so."

The jury returned a sentence of death.

## II. Post-trial Procedural History

The Nevada Supreme Court affirmed Petrocelli's conviction and sentence. *See Petrocelli v. State*, 692 P.2d 503 (Nev. 1985). Petrocelli filed a timely state petition for post-conviction relief, which was denied on the merits by the state courts. He then filed a federal habeas petition, which the district court dismissed without prejudice because it contained unexhausted claims. Petrocelli returned to state court to exhaust these claims, which the state courts dismissed as procedurally defaulted.

Petrocelli filed his second federal habeas petition *pro se* on October 28, 1994, and then filed a counseled amended petition in 1996. The amended petition raised various claims,

including two claims challenging the reference to the Pardon Board in Jury Instruction 5. The first of those two claims, labeled "Ground 4," alleged that the instruction improperly suggested that Petrocelli could receive "a pardon or parole" if sentenced to life without the possibility of parole because it allowed the jury to "inappropriately speculate." The second claim, labeled "Ground 6," alleged that the jury instruction "inaccurately led the jury to believe that Petitioner, under Nevada law, could receive parole" even though under Nev. Rev. Stat. § 213.1099, due to his probation violations, Petrocelli was not eligible for parole. The district court dismissed Ground 6 and several other grounds as an "abuse of the writ" because they had not been raised in Petrocelli's first federal habeas petition. It then denied Petrocelli's amended petition in September 1997, finding all claims either unexhausted, procedurally defaulted, or nonmeritorious.

On appeal, we reversed in part and remanded for the district court to consider various claims it had improperly dismissed as an "abuse of the writ," including Ground 6. *Petrocelli v. Angelone*, 248 F.3d 877, 884–85, 887 (9th Cir. 2001). Because in his briefing to us Petrocelli had not made any argument with respect to Ground 4, we deemed that ground abandoned. *Id.* at 880 n.1. On remand, the district court found various claims unexhausted and stayed Petrocelli's petition in order to permit him to return to state court to exhaust them.

Petrocelli filed his third state petition for post-conviction relief on August 11, 2003, raising a number of claims. The state district court denied Petrocelli's petition, denying some claims on the merits and holding some claims procedurally barred. Petrocelli appealed from the state district court's denial, and the Nevada Supreme Court affirmed.

Petrocelli then returned to federal court and filed his fourth amended petition, the operative petition in this case. In his petition, he challenged, *inter alia*, Jury Instruction 5, in language similar to that used in the claim he had labeled "Ground 6" in his earlier petition. In this petition, he labeled the challenge "Claim 4." The district court dismissed Claim 4 after concluding that it corresponded to Ground 4 of Petrocelli's earlier petition, which we had deemed abandoned in our earlier decision. The district court required Petrocelli to abandon various claims it deemed unexhausted, and rejected the remaining claims on the merits.

The district court issued a certificate of appealability as to three claims: (1) a claim that trial counsel was ineffective for failing to object to the admission of Powell's testimony; (2) a claim that Petrocelli's April 20 and 27 statements were admitted in violation of the Fifth, Sixth, and Fourteenth Amendments; and (3) a claim that introduction of Dr. Gerow's testimony violated Petrocelli's Fifth and Sixth Amendment rights. We issued a certificate of appealability as to three additional claims, including a claim challenging Jury Instruction 5.

### III. Jurisdiction and Standard of Review

We have jurisdiction over the district court's denial of Petrocelli's federal habeas petition pursuant to 28 U.S.C. §§ 1291 and 2253(c).

We review de novo a district court's decision to grant or deny a habeas petition. *Curiel v. Miller*, 830 F.3d 864, 868 (9th Cir. 2016). The petition at issue was filed in 1994, well before the April 24, 1996, effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Thus,

AEDPA's deferential standard of review does not apply. *See Woodford v. Garceau*, 538 U.S. 202, 207 (2003); *see also Thomas v. Chappell*, 678 F.3d 1086, 1100 (9th Cir. 2012) ("We have consistently held that where . . . a petitioner filed a habeas application before the effective date of AEDPA and the district court retained jurisdiction over the case, AEDPA does not apply even if the petitioner files an amended petition after the effective date of AEDPA.").

Under pre-AEDPA law, "we review de novo questions of law and mixed questions of law and fact, whether decided by the district court or the state courts." *Thomas*, 678 F.3d at 1101 (alteration omitted) (quoting *Sivak v. Hardison*, 658 F.3d 898, 905 (9th Cir. 2011)). Whether a constitutional error was harmless is a mixed question of law and fact that is reviewed de novo. *Ghent v. Woodford*, 279 F.3d 1121, 1126 (9th Cir. 2002). State court findings of fact are "entitled to a presumption of correctness unless they are 'not fairly supported by the record.'" *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (quoting former 28 U.S.C. § 2254(d)(8)).

## IV. Discussion

### A. Guilt Phase Claims

Petrocelli challenges his conviction on three grounds. First, he contends that his trial counsel was ineffective for failing to object to the testimony of Powell, the Oklahoma car salesman, on the ground that Powell's testimony was the fruit of Petrocelli's April 19 statement, which had been obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Edwards v. Arizona*, 451 U.S. 477 (1981). Second, he contends that the use at trial of his April 20 and 27 statements violated the Fifth, Sixth, and Fourteenth Amendments. Third,

he contends that a guilt-phase jury instruction defining premeditation and deliberation unconstitutionally relieved the State of its burden of proving each element of the crime beyond a reasonable doubt.

For the reasons that follow, each contention fails.

### 1.  Powell Testimony

Petrocelli contends that trial counsel was ineffective for failing to object to Powell's testimony as fruit of a *Miranda* and *Edwards* violation.  As recounted above, Powell was a used car salesman from whom Petrocelli had stolen a car during a test drive, in a manner similar to his theft of the truck in Nevada.  The prosecution learned of the prior vehicle theft during the April 19 interrogation when Petrocelli admitted he had stolen a vehicle from a "Dub Peterson" dealership in Oklahoma City.

To show ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant must show that his counsel's representation "fell below an objective standard of reasonableness" and that he was prejudiced by the deficient performance.  *Id.* at 687–88.  A failure to make a motion to suppress that is unlikely to succeed generally does not constitute ineffective assistance of counsel.  *See Premo v. Moore*, 562 U.S. 115, 124 (2011); *see also Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994) (holding that failure to make a motion to suppress which would "be meritless on the facts and the law" does not constitute ineffective assistance of counsel).

Before beginning the interrogation on April 19, the police officers advised Petrocelli of his *Miranda* rights, and

Petrocelli signed a statement indicating that he understood them.  The officers then began questioning Petrocelli.  For some time he answered questions freely.  When he later became evasive, one of the officers observed, "I thought . . . you wanted to talk to us about this."  Petrocelli responded, "I do," and continued answering questions.  Shortly afterwards, Petrocelli stated, "I'd sort of like to know what my . . . lawyer wants me to do."  (Ellipsis in original.)  When the officer asked if Petrocelli had understood his rights, he answered that he did.  Later in the questioning, Petrocelli stated, "I even have a . . . part-time attorney and just to answer questions for me."  (Ellipsis in original.)  The officer then asked, "Is it . . . what you're telling me is you don't want to answer any questions without an attorney?"  (Ellipsis in original.)  Petrocelli responded, "No. I just need to have something answered.  That's all."  The officer told him, "Well, we don't have an attorney . . . present with us right now.  Like I indicated before if at any time you don't want to . . . answer any questions or make any statements you don't have to."  (Ellipses in original.)  The officer resumed questioning, and Petrocelli confessed to stealing cars by going to car lots and taking them for test drives.  He mentioned one particular theft from a "Dub Peterson" dealership in Oklahoma City.  This led the police to Powell, who testified at Petrocelli's trial.

When a suspect invokes his Fifth Amendment right to have counsel present during a custodial interrogation, "the interrogation must cease until an attorney is present."  *Miranda*, 384 U.S. at 474.  Police may not continue questioning a suspect without counsel present "unless the accused himself initiates further communication."  *Edwards*, 451 U.S. at 484–85. Only an unambiguous invocation of the right to counsel triggers protection under *Edwards*.  An invocation is unambiguous if the accused "articulate[s] his

desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994). Applying this test, the Supreme Court held in *Davis* that the statement, "Maybe I should talk to a lawyer," was ambiguous and did not constitute a request for counsel. *Id.* at 462.

Under *Davis*, Petrocelli's language was insufficient to constitute an unambiguous invocation of counsel. Because Petrocelli failed to invoke his right to counsel unambiguously, the April 19 interrogation was not conducted in violation of *Miranda* or *Edwards.* Petrocelli's trial counsel was therefore not ineffective in failing to move to suppress Powell's testimony as fruit of the interrogation.

### 2. April 20 and April 27 Statements

Petrocelli contends that the use at trial of his statements to the detectives on April 20 and April 27 violated his Fifth, Sixth, and Fourteenth Amendment rights. Prosecutor Laxalt used Petrocelli's statement that his killing of Barker was an "accident" to impeach Petrocelli's testimony that the Wilson shooting was also an accident. Laxalt also impeached Petrocelli by confronting him with various inconsistencies between his statements and his trial testimony.

Petrocelli contends that he invoked his right to counsel on April 19, and that his statements taken on that date and thereafter were therefore taken in violation of his Fifth and Sixth Amendment rights. Petrocelli's counsel was appointed on April 20 but was not present at the interrogations on April 20 and 27. Assuming without deciding that Petrocelli's Fifth or Sixth Amendment right was violated, the rule is well

established that a voluntary statement taken in violation of the Fifth or Sixth Amendment may be used for impeachment. *See Michigan v. Harvey*, 494 U.S. 344, 345–46 (1990); *United States v. Gomez*, 725 F.3d 1121, 1125–26 (9th Cir. 2013). Because the State used the statements at issue only for impeachment, Petrocelli's contention fails.

Petrocelli next contends that his April 20 and 27 statements were involuntary and thus that their admission was unconstitutional. Statements are unconstitutionally involuntary when a "'defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

Petrocelli contends that his statements were involuntary because they were "obtained by inducements." "Inducements to cooperate are not improper . . . unless under the total circumstances it is plain that they have overborne the free will of the suspect." *United States v. Okafor*, 285 F.3d 842, 847 (9th Cir. 2002). Here, there is no indication that Petrocelli's will was overborne. Before making statements on April 20, Petrocelli told officers he had several "preconditions." Sergeant Dickson testified that Petrocelli was told that they would do what they could, but that no promises were made. His interrogators' partial compliance with his preconditions, while perhaps an inducement to talk, hardly constituted an overbearing of his will.

Petrocelli also contends that his April 20 and 27 statements were involuntary because, on April 19, Sergeant Barnes told him that he thought talking to the detectives "could do . . . nothing but help." In *Henry v. Kernan*,

197 F.3d 1021 (9th Cir. 1999), we held that a confession was involuntary when the interrogating officer ignored a suspect's clear invocation of his right to counsel and stated, "Listen, what you tell us we can't use against you right now." *Id.* at 1027. We noted that the officers' refusal to cease questioning in the face of repeated requests for counsel "generate[d] a feeling of helplessness" and that the officers deliberately violated *Miranda* in order to obtain a statement they could use for impeachment purposes. *Id.* at 1028–29.

The circumstances of the *Henry* interrogation are significantly different from those of Petrocelli's interrogation. As discussed above, Petrocelli never clearly invoked his right to counsel on April 19. When Petrocelli was asked if he was requesting a lawyer, he responded "no." The officers' attempts to clarify whether Petrocelli was invoking his rights differentiate the April 19 interrogation from the *Henry* interrogation, both because they likely reduced the feeling of helplessness that concerned us in *Henry* and because they suggest the detectives were not attempting deliberately to violate *Miranda*. Considering the totality of the circumstances, Sergeant Barnes' remark was not sufficiently coercive to render Petrocelli's April 20 and 27 statements involuntary.

## 3. Jury Instruction on Premeditation and Deliberation

Petrocelli contends that the jury instruction defining "premeditation" and "deliberation" violated due process by collapsing the two requirements and relieving the State of its burden of proving that the killing was both deliberate and premeditated. *See Byford v. State*, 994 P.2d 700, 712–15 (Nev. 2000); *Polk v. Sandoval*, 503 F.3d 903, 910–11 (9th Cir. 2007), *overruled in part by Babb v. Lozowsky*, 719 F.3d

1019, 1028–30 (9th Cir. 2013). The district court concluded that Petrocelli had not exhausted this claim and required Petrocelli either to abandon the claim or risk dismissal of his petition. Faced with this choice, Petrocelli filed a notice of abandonment "of all unexhausted claims." Petrocelli contends that the district court erroneously determined that the claim was unexhausted.

"Exhaustion requires the petitioner to 'fairly present' his claims to the highest court of the state." *Cooper v. Neven*, 641 F.3d 322, 326 (9th Cir. 2011) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999)). Petrocelli raised this jury instruction claim in his third state habeas petition, but he did not appeal the state district court's denial of the claim to the Nevada Supreme Court. Petrocelli argues that his failure to appeal to the Nevada Supreme Court should be excused, contending that he could not have raised the claim until our decision in *Polk* in 2007, when we held that a jury instruction collapsing the premeditation and deliberation elements of first-degree murder violates the Due Process Clause. *Polk*, 503 F.3d at 904. This argument is unpersuasive in light of Petrocelli's having raised this claim in the state district court, before we decided *Polk*, and in light of his assertion that this claim was based "on clearly established and long existing federal law, namely *Sandstrom v. Montana*, 442 U.S. 510 (1979) and *Francis v. Franklin*, 471 U.S. 307 (1985)."

## B. Penalty Phase *Estelle* Claim

Petrocelli makes several penalty phase claims. In one of them, he contends that Dr. Gerow's testimony violated his Fifth and Sixth Amendment rights, articulated in *Estelle v. Smith*, 451 U.S. 454 (1981). We agree with this contention,

and on that basis grant the writ as to the death penalty. We therefore do not reach Petrocelli's other penalty phase claims.

### 1. Waiver

The district court held that Petrocelli's *Estelle* claim was neither unexhausted nor procedurally defaulted, and that the Nevada Supreme Court denied it on the merits. On appeal to us, the State does not contest this holding. *See Robinson v. Lewis*, 795 F.3d 926, 934 (9th Cir. 2015) (holding that a petitioner waived an argument by failing to dispute the district court's rejection of the argument in his briefing on appeal).

Petrocelli spends six pages of his opening brief to us arguing that the admission of Dr. Gerow's testimony violated *Estelle*. The State does not respond to Petrocelli's *Estelle* argument. In neither its answering brief nor its supplemental brief does the State so much as cite *Estelle*, let alone respond to Petrocelli's argument. We therefore conclude that the State has waived any defense to Petrocelli's *Estelle* argument.

### 2. *Estelle*

Even if the State had not waived its defense to Petrocelli's *Estelle* argument, we would hold that the admission of Dr. Gerow's testimony violated *Estelle* and that the violation was not harmless.

### a. *Estelle* Violation

In *Estelle*, Dr. James Grigson was appointed by a Texas trial court to examine capital defendant Ernest Smith to determine his competency to stand trial. Grigson examined

Smith for about ninety minutes and determined that he was competent.  Grigson gave no *Miranda* warning to Smith during the course of the examination.  At the time of the examination, Smith's Sixth Amendment right to counsel had attached.  Grigson did not notify Smith's attorney that he would examine his client.

Dr. Grigson testified, over objection, during the penalty phase of Smith's trial as to his future dangerousness.  He testified that Smith was "a very severe sociopath"; that Smith "will continue his previous behavior"; that Smith's sociopathic condition will "only get worse"; and that there "is no treatment, no medicine . . . that in any way at all modifies or changes this behavior."  451 U.S. at 459–60 (alteration in original) (internal quotation marks omitted).  The jury returned a verdict of death.

The Supreme Court held that Dr. Grigson's testimony violated the Fifth and Sixth Amendments.  The Court held that the Fifth Amendment privilege against self-incrimination applied, and that *Miranda* warnings were required because "Dr. Grigson's prognosis as to future dangerousness rested on statements [Smith] made . . . in reciting the details of the crime."  *Id.* at 464.  "When Dr. Grigson went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role . . . became essentially like that of an agent of the State."  *Id.* at 467.  The Court held that the Sixth Amendment right to counsel applied because "adversary judicial proceedings" had been initiated against Smith, and that Grigson's interview was a "critical stage" of the proceedings.  *Id.* at 469–70.  "[Smith] was denied the assistance of his attorneys in making the significant decision of whether to submit to the examination

and to what end the psychiatrists's findings could be employed." *Id.* at 471.

*Estelle* was decided in May 1981. Dr. Gerow interviewed Petrocelli in Washoe County Jail almost a year later, in April 1982. Petrocelli's trial took place during the last week of July and first week of August 1982.

In addressing Petrocelli's third petition for post-conviction relief, the state district court heard testimony from Dr. Gerow and from defense counsel Wishart, and received into evidence the Washoe County Jail visitors' log and Gerow's April 27 letter to Prosecutor Laxalt. In rejecting a claim of ineffective assistance of counsel, the court made factual findings directly relevant to Petrocelli's *Estelle* claim. The court wrote:

> The sequence of events appears to be as follows: Petitioner sought a psychiatrist on April 20, 1982. Laxalt briefed Gerow on April 21, and on that date, [Gerow] interviewed the Petitioner. Defense Attorney Wishart and Investigator Ford also interviewed Petitioner on April 21, 1982 subsequent to an appointment in the justice court on that date. It is not clear as to whether the doctor or the lawyer arrived at the jail first.

The court wrote, further, "Dr. Gerow and Prosecutor Laxalt are not entirely clear nor consistent about the purpose for which the doctor was hired. However, Gerow makes it clear that he informed Petitioner that the interview was not

confidential and that he would see Petitioner again on an as-needed basis." The court concluded:

> Dr. Gerow's understanding of his engagement was to determine Petitioner's competency and to render some further treatment. . . . No reasonably effective trial or appellate counsel would conclude from this record that Dr. Gerow was a court-authorized psychiatrist nor an agent for the prosecutor.

The state district court's findings are "not fairly supported by the record" and thus are not entitled to a presumption of correctness. *Silva*, 279 F.3d at 835 (quoting former 28 U.S.C. § 2254(d)(8)). Indeed, its findings are demonstrably wrong in nearly every particular.

First, it is not true that counsel for Petrocelli was appointed on April 21, the day of Dr. Gerow's interview. Rather, the appointment was made the day before, on April 20.

Second, it not true that there is an ambiguity "as to whether the doctor or the lawyer arrived at the jail first." The visitors' log at the Washoe County Jail is unambiguous. Defense attorney Wishart and investigator Ford signed the visitors' log at about 1:50 pm. They left at about 2:20 pm. Dr. Gerow signed the visitors' log at about 3:50 pm.

Third, it is not true that "[n]o reasonably effective . . . counsel would conclude . . . that Dr. Gerow was . . . an agent for the prosecutor." Gerow wrote "D.A." in the "relationship" box of the visitors' log. Wishart knew Gerow well. He testified in post-conviction proceedings that Gerow

had a "prosecution bias," and that he never would have hired him.

Fourth, it is not true that Dr. Gerow "ma[de] clear that he informed Petitioner . . . that he would see Petitioner again on an as-needed basis." Gerow informed Prosecutor Laxalt in his April 27 letter that he would see Petrocelli on an "'as needed' basis." Gerow testified in state court post-conviction proceedings that he meant "as needed *by Mr. Laxalt*."

Fifth, it is not true that "Dr. Gerow's understanding of his engagement was . . . to render some further treatment." Gerow never had any understanding that he would provide treatment to Petrocelli. Petrocelli was under the illusion that Gerow had come to see him in response to his request for psychiatric counseling, but Gerow was under no such illusion.

The facts are that Prosecutor Laxalt asked Dr. Gerow to visit Petrocelli in the Washoe County Jail to determine his competency to stand trial. Gerow interviewed Petrocelli in the jail in the late afternoon of April 21, shortly after defense attorney Wishart and investigator Ford had visited him. The Reno Justice Court had appointed the Washoe County Public Defender's office as counsel for Petrocelli the day before, on April 20. Wishart and Ford's names and signatures were on line three of the visitors' log of the jail, with the notation "WCPD/ATT." Gerow signed in as a visitor on line four of the same page with the notation "D.A." Wishart's name and capacity would have been easily visible to Gerow when he signed in. Gerow never sought permission from Wishart to evaluate Petrocelli. Laxalt never asked Gerow to provide treatment to Petrocelli, and Gerow never provided any. On April 27, Gerow wrote a letter to Laxalt reporting that he believed Petrocelli to be competent, and volunteered to

provide further assistance to Laxalt "as needed." Gerow testified during the penalty phase of Petrocelli's capital trial. He testified, based on his interview with Petrocelli on April 21, that Petrocelli was dangerous and not treatable. Gerow's final words during direct examination were, "There is no cure."

The parallels between *Estelle* and this case are striking. Dr. Grigson, like Dr. Gerow in this case, visited the defendant in jail to determine his competency to stand trial. Grigson, like Gerow, failed to provide *Miranda* warnings. Grigson, like Gerow, was acting as an agent of the state. Indeed, the case against Gerow's testimony is even stronger than against Grigson's, for Grigson was appointed by the court, whereas Gerow was acting at the request of the prosecutor. The defendant in *Estelle*, like Petrocelli, already had appointed counsel. Grigson, like Gerow, did not seek or obtain permission from defendant's counsel to visit or evaluate his client. Grigson, like Gerow, testified during the penalty phase of defendant's trial that the defendant was incurable.

We conclude from the foregoing that the admission of Dr. Gerow's testimony during the penalty phase of Petrocelli's trial was a flagrant violation of his Fifth and Sixth Amendment rights under *Estelle*.

### b. Harmless Error

An "error of the trial type" is not harmless if it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). "There must be more than a 'reasonable possibility' that the error was harmful." *Davis v. Ayala*, 135 S. Ct. 2187,

2198 (2015) (quoting *Brecht*, 507 U.S. at 637). "[R]elief is appropriate only if the prosecution cannot demonstrate harmlessness." *Id.* at 2197. Where a judge "is in 'grave doubt as to the harmlessness of the error, the habeas petitioner must win.'" *Pensinger v. Chappell*, 787 F.3d 1014, 1029 (9th Cir. 2015) (quoting *California v. Roy*, 519 U.S. 2, 5 (1996) (per curiam)). We conclude that the State has not demonstrated that the *Estelle* error was harmless.

The jury knew that Petrocelli had committed two murders. He was on trial for murdering James Wilson, and the jury had been told that he had also murdered Melanie Barker. Maureen Lawler, Barker's mother, testified at the penalty phase as to the circumstances of the three-day kidnaping in Washington State. Petrocelli was death-eligible because when he killed Wilson he had already been convicted of kidnaping Barker. The jury had ample basis, both legal and emotional, for imposing a capital sentence. The question before us is whether it would have done so absent Dr. Gerow's testimony. The precise question is whether there was "more than a 'reasonable possibility'" that the jury would have imposed a life sentence if it had not heard Gerow's testimony. *Davis*, 135 S. Ct. at 2198 (quoting *Brecht*, 507 U.S. at 637). The burden is on the State to demonstrate that there was not such a possibility.

In any capital case, particularly if a defendant might eventually be released from prison, a central question at sentencing is whether the defendant is likely to kill again. We put to one side the report of Dr. Petrich, who evaluated Petrocelli before he killed Wilson and Barker. Not counting Petrich's report, there was evidence from three medical professionals who diagnosed Petrocelli, assessed his dangerousness, and evaluated his amenability to treatment.

Dr. Gutride reported that Petrocelli "cried openly" during his interview, and that his "distraught behavior had the quality of his practically begging for help." He reported that Petrocelli "desperately want[ed] to know what is the matter with him" and told Gutride that he had "called crisis lines in every city, but [had] been unable to get any help." Gutride observed that "[t]he personal distress [Petrocelli] exhibited during the interview seems genuine" and that Petrocelli "may truly desire some mental health treatment." Gutride wrote that Petrocelli's "ability to profit from such treatment is questionable" because of his distrust of others, and he concluded that "treatment should be offered in a setting where the client can be closely monitored." In his live testimony, Gutride stated that his diagnosis did not "imply an individual is unable to think properly or conduct themselves conventionally. It relates mostly to a style of living."

Dr. Chappel reported that Petrocelli "repeatedly asked for help" while in jail in Seattle and that Petrocelli attempted to commit suicide while there. Chappel reported that Petrocelli "viewed the experience as one of asking for help and not getting it." Petrocelli "expresse[d] a wish for further evaluation or treatment so he [could] find out whether or not he killed on purpose." Chappel concluded that "a more extensive evaluation" would be useful in order for Petrocelli "to have a better understanding of the reasons for his loss of impulse control and his reason for killing someone who was close to him." Chappel wrote that "[a] period of evaluation and a trial of treatment might serve a useful purpose in preventing any further homicidal outbursts of rage on his part."

Both Dr. Gutride and Dr. Chappel concluded that Petrocelli wanted mental health treatment, and that he felt

that he had sought and been denied such treatment. Both doctors held out the possibility of treatment. Gutride acknowledged that Petrocelli's ability to profit from treatment was "questionable" because of his distrust of others, but he did not state that Petrocelli was untreatable. Rather, he recommended that Petrocelli be "closely monitored" during treatment. Chappel stated that treatment could be useful both for Petrocelli's own understanding and in order to prevent "further homicidal outbursts."

Dr. Gerow's testimony was inconsistent with the reports of Drs. Gutride and Chappel. Gerow stated unequivocally that Petrocelli was dangerous and would always remain so. He testified that Petrocelli had a psychopathic personality for which there is "no treatment at all." He elaborated, "A psychiatrist doesn't treat the condition because it's not treatable." Gerow's last words on direct examination were, "There is no cure."

Dr. Gerow's live testimony likely had a greater impact on the jury than the analyses of Drs. Gutride and Chappel. Defense counsel Wishart chose not to put Gutride and Chappel on the stand, submitting only their written reports. Prosecutor Laxalt called Gutride to the stand in an attempt to undermine his diagnosis and assessment of dangerousness on the ground that Petrocelli had "faked 'bad'" when taking formal intelligence tests. Gutride insisted that his diagnosis was correct, and that the diagnosis did not "imply an individual is unable to think properly or conduct themselves conventionally." Gutride's live testimony was very short, occupying not quite two pages of transcript. His testimony was followed directly by Gerow's more extensive live testimony that conflicted with Gutride and Chappel's written reports and Gutride's brief testimony. *See Satterwhite v.*

*Texas*, 486 U.S. 249, 259–60 (1988) (referring to a psychiatrist's testimony that defendant was "beyond . . . rehabilitation" as his "most devastating" statement).

The effect of Dr. Gerow's testimony was magnified by an erroneous jury instruction. Jury Instruction 5, quoted above, indicated to the jury that even if it sentenced Petrocelli to life without parole, he might nonetheless be released by the Nevada Board of Pardon Commissioners. While a trial court may instruct a capital jury about the possibility of executive clemency, *California v. Ramos*, 463 U.S. 992, 994 (1983), "if an instruction is inaccurate or misleading it will not be upheld." *Hamilton v. Vasquez*, 17 F.3d 1149, 1160 (9th Cir. 1994). In *Sechrest v. Ignacio*, 549 F.3d 789, 810 (9th Cir. 2008), we held in a Nevada capital case that an instruction identical to Jury Instruction 5 was unconstitutional because it was inaccurate. Under Nevada law in the 1980s, "an individual who [was] on probation at the time he commit[ed] another offense . . . [was] not eligible for parole by the Parole Board on that offense." *Id.* at 810. Petrocelli had absconded twice from his drug treatment program in Washington State, thereby failing to satisfy a condition for successfully completing his probationary period. Petrocelli therefore would not have been eligible for parole from a Nevada life sentence. *See Geary v. State*, 930 P.2d 719, 723–24 (Nev. 1996) (per curiam). The use of Jury Instruction 5 in Petrocelli's case was thus unconstitutional for the same reason it was unconstitutional in *Sechrest*.

Prosecutor Laxalt made sure that the jury understood the implications of Jury Instruction 5. In closing argument he emphasized Dr. Gerow's testimony that Petrocelli was an incurable psychopath, and the possibility of Petrocelli's release on parole:

He will never change.  There is no cure for being a psychopath.  . . .  Should the community bear the risk of ever having this defendant on the street again, walking free, on the run?

. . .

[N]o society, no community, no county, no city, no state, should ever have to risk again Tracy Petrocelli on the street.

. . .

I ask you to consider years down the road when the decisions are being made at the Pardons Board and the Parole Board and we have all gone our separate ways and Mr. Petrocelli is there, the sole person applying for the pardon or applying for parole crying tears of remorse and telling the people how it wasn't he who was the murderer of Mr. Wilson it was an accident and he got railroaded, and telling people that it wasn't he who was the murderer of Melanie it was an accident, and he was railroaded.  . . .  Rehabilitation to be imposed in this case? That's a sad fact, but it's to be faced.

Laxalt's argument "had the effect of creating a false choice between sentencing [Petrocelli] to death and sentencing him to a limited period of incarceration." *Simmons v. South Carolina*, 512 U.S. 154, 161 (1994).

It is possible that Petrocelli has not preserved, on appeal to us, his ability to challenge the district court's dismissal of Claim 4, challenging Jury Instruction 5. But whether Petrocelli may now challenge the instruction is irrelevant to the harmlessness of the *Estelle* violation. In determining harmlessness, the question before us is not the constitutionality of the instruction but rather its effect on the improper admission of Dr. Gerow's testimony. Whether Jury Instruction 5 is constitutional or not, its effect on Gerow's improperly admitted testimony is the same.

We have encountered Dr. Gerow before. He testified for the prosecution in *Sechrest* in very much the same manner he testified for the prosecution in the case before us. Gerow testified that Sechrest "was an incurable sociopath" who was "extremely dangerous and could not be rehabilitated." *Sechrest*, 549 F.3d at 813. We held in *Sechrest* that the combined effect of Gerow's testimony and an instruction identical to Instruction 5 "had a substantial influence on the jury's decision to sentence Sechrest to death." *Id.* We similarly conclude, in this case, that Gerow's improperly admitted testimony, understood in the light of Jury Instruction 5, "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (quoting *Kotteakos*, 328 U.S. at 776). If there was "more than a 'reasonable possibility'" that the jury would have imposed a life sentence absent the *Estelle* error, the error was not harmless. *Davis*, 135 S. Ct. at 2198 (quoting *Brecht*, 507 U.S. at 637). The State has the burden of demonstrating harmlessness, *id.* at 2197, and it has not carried that burden.

Conclusion

We affirm the district court's denial of Petrocelli's petition for a writ of habeas corpus with respect to the conviction, but reverse with respect to the death sentence. We remand with instructions to grant the writ as to the penalty unless, within a reasonable time, the State grants a new penalty phase trial or imposes a lesser sentence consistent with the law.

**AFFIRMED in part, REVERSED in part, and REMANDED.**

CHRISTEN, Circuit Judge, concurring:

I agree that Petrocelli's death sentence must be reversed. I write separately because, in my view, even if the State could show that the prosecutor's tactics had not prejudiced the jury's verdict, Petrocelli's case is one of the very few in which deliberate prosecutorial misconduct and egregious trial errors warrant habeas relief. *See Brecht v. Abrahamson*, 507 U.S. 619, 638 n.9 (1993) (stating that a deliberate and especially egregious trial error, or one that is combined with a pattern of prosecutorial misconduct, might warrant habeas relief, even if the jury's verdict is not substantially influenced). *Brecht*'s footnote nine is rarely employed, but the Fifth and Seventh Circuits have each relied on it one time in cases where an error (or errors) did not easily fit into either the "structural error" or "trial error" category. The errors in Petrocelli's case were equally pervasive, flouted Supreme Court authority, and undermined the integrity of the criminal justice process.

Tracy Petrocelli's trial, from voir dire to the death penalty verdict, lasted just ten days (July 26–30, 1982; August 2–6, 1982). The penalty phase took one day. The introduction of evidence began at 11:30 AM on August 6, and the jury's verdict, a death sentence, was returned at 10:52 PM. The defense introduced brief psychiatric reports but only called Petrocelli to testify. The prosecution called Dr. Gerow, a psychiatrist, to testify about Petrocelli's mental condition. The majority opinion thoroughly and persuasively explains how the prosecutor procured Dr. Gerow's testimony and why the prosecutor's conduct was a flagrant violation of *Estelle v. Smith*, 451 U.S. 454 (1981) (holding that a psychiatrist's testimony about the defendant's future dangerousness in a capital felony trial violated the defendant's Fifth and Sixth Amendment rights where the defendant was not given *Miranda* warnings before his psychiatric examination).

A separate layer of error also infected this trial because the State's *Estelle* violation dovetailed with an inflammatory and incorrect jury instruction. Specifically, the trial court told the jury that "[u]nder the laws of the State of Nevada, . . . [t]he State Board of Pardon Commissioners . . . would have the power to modify any sentence at a later date." This instruction (Jury Instruction 5) was wrong because Petrocelli was not eligible for parole. *See* Nev. Rev. Stat. § 213.1099(4); *Sechrest v. Ignacio*, 549 F.3d 789, 810 (9th Cir. 2008). Yet the prosecution told the jury that Petrocelli might someday walk the streets "[a]mong ordinary people" and "kill again" if the jury did not sentence him to death. The context and nature of these combined errors and misconduct so infected the integrity of the proceedings as to defy categorization and the typical harmlessness analysis.

*Brecht*'s harmless-error standard applies on collateral review of federal constitutional trial errors. *See Brecht*, 507 U.S. at 622. Typically, "[t]rial error 'occur[s] during the presentation of the case to the jury,' and is amenable to harmless-error analysis because it 'may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].'" *Id.* at 629 (alterations in original) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 307–08 (1991)). Prosecutorial misconduct is trial error. *See Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012). "At the other end of the spectrum of constitutional errors lie 'structural defects in the constitution of the trial mechanism, which defy analysis by harmless-error standards.'" *Brecht*, 507 U.S. at 629 (quoting *Fulminante*, 499 U.S. at 309). Structural errors, such as the deprivation of the right to counsel, "infect the entire trial process" and require automatic reversal of the conviction. *Id.* at 629–30; *see also Hardnett v. Marshall*, 25 F.3d 875, 879 (9th Cir. 1994) (stating that unlike trial errors, structural errors "may not be considered harmless").

"Not every error, however, is easily shoe-horned into one of those neat categories." *United States v. Harbin*, 250 F.3d 532, 544 (7th Cir. 2001). "The nature, context, and significance of the violation, for instance, may determine whether automatic reversal or the harmless error analysis is appropriate." *Id.* (internal quotation marks and citation omitted). In footnote nine of *Brecht*, the Supreme Court left open the possibility "that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." 507 U.S. at 638 n.9. "This hybrid,

[f]ootnote [n]ine error as we denominate it, is thus assimilated to structural error and declared to be incapable of redemption by actual prejudice analysis." *Hardnett*, 25 F.3d at 879. "The integrity of the trial, having been destroyed, cannot be reconstituted by an appellate court." *Id.*

In Petrocelli's case, the first error arose when the prosecutor used a psychiatrist to interview Petrocelli without informing his lawyer or advising him of his right to remain silent. The Supreme Court held in *Estelle* that the prosecution may not rely on statements made by a defendant during a psychiatric examination to prove future dangerousness if the defendant was not apprised of his *Miranda* rights and was denied the assistance of his counsel in deciding whether to submit to the examination. 451 U.S. at 467–71 ("When Dr. Grigson went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting."). Decided in May of 1981, *Estelle* had been on the books for about a year when the state prosecutor enlisted Dr. Gerow to interview Petrocelli, and it had been controlling law for about fifteen months by the time the prosecutor called Dr. Gerow to testify. Despite *Estelle's* clear rule that the government may not circumvent *Miranda* by using a health care professional as an agent to interview a defendant without the benefit of defense counsel, the prosecutor responded to Petrocelli's request for psychiatric help by sending Dr. Gerow to the jail to interview Petrocelli under the pretense of providing mental health counseling. There is no question that the prosecutor's goal was to use the result of the interview to prosecute Petrocelli, not to respond

to Petrocelli's request for mental health counseling.  The prosecutor later said as much, as did Dr. Gerow.  It is equally clear that Petrocelli could not have anticipated that the doctor would testify for the prosecution.

In state post-conviction proceedings, the prosecutor testified and agreed that he asked Dr. Gerow to interview Petrocelli because he was concerned about a possible competency or insanity defense.  The prosecutor testified that he "want[ed] to see what ma[de] [Petrocelli] tick," and also candidly admitted that he sent Dr. Gerow to interview Petrocelli for "a dual purpose."  According to the prosecutor, "Mr. Petrocelli wanted to see a counselor, a psychiatrist.  I wanted him to be seen by one in order to make sure that we had a competent defendant."  The prosecutor selected Dr. Gerow, as opposed to another psychiatrist or psychologist, because he "had a lot of trust in Dr. Gerow."  Despite the rule from *Estelle*, the prosecutor recalled that he had not instructed Dr. Gerow to tell Petrocelli that he was there at the request of the prosecution, that he had not instructed Dr. Gerow to advise Petrocelli of his *Miranda* rights, and that he had not instructed Dr. Gerow about what to do if Petrocelli mentioned that he was represented by counsel—all because Dr. Gerow was supposedly seeing Petrocelli "jointly." Although the prosecutor described the interview as having a "dual purpose," defense counsel Lawrence Wishart denied that there was any joint defense purpose for the interview.  He was not informed of the interview, nor consulted about the selection of the expert.  In fact, Wishart was familiar with this psychiatrist, and he testified that he would not have hired Dr. Gerow because he thought Dr. Gerow had "a prosecution bias."

Dr. Gerow also testified in the post-conviction proceedings. He described conferring with the prosecutor by telephone before meeting with Petrocelli, and acknowledged that he met with Petrocelli on April 21, 1982, at the prosecutor's request, to determine whether Petrocelli was competent to stand trial and to assess Petrocelli's ability to distinguish right from wrong. Dr. Gerow doubted very much that the prosecutor instructed him to advise Petrocelli of his *Miranda* rights, and he was definite in his testimony that he did not do so. He also confirmed that when he wrote in his one-page letter report to the prosecutor that he would see Petrocelli again "as needed," he meant as needed by the prosecution, not as needed by Petrocelli.[1] In short, the record shows that Dr. Gerow's interview with Petrocelli had no therapeutic purpose; it was arranged to advance the prosecution's case in blatant violation of *Estelle*.

The prosecution exploited its *Estelle* violation to full advantage at trial.[2] Having interviewed Petrocelli without

---

[1] Dr. Gerow's report verifies that he examined Petrocelli at the prosecutor's request, that Petrocelli was cooperative and an able historian, and that a mental status examination was performed. In seven lines of text, a single paragraph summarizes Petrocelli's social history from childhood, his mental health history from childhood, and the impression that he was not psychotic when interviewed. The letter then deems Petrocelli competent to stand trial, and states that Dr. Gerow will see Petrocelli again on an "as needed" basis.

[2] The State relies heavily on the Nevada Supreme Court's ruling that even if Petrocelli had properly reserved his claim that Dr. Gerow's interview violated *Miranda v. Arizona*, Petrocelli failed to show that it prejudiced him in light of other compelling testimony about future dangerousness. The State also repeats the Nevada trial court's factual errors and raises most of the arguments that the majority opinion addresses: (1) the incorrect statement that Petrocelli had not yet been

informing him of his *Miranda* rights and without notifying Petrocelli's counsel, Dr. Gerow told the jury that he had diagnosed Petrocelli as "a psychopathic." He testified that although the "violence potential" of psychopaths "varies," the most concerning traits associated with psychopaths (incurability, callousness, a high propensity for violence) "describe[] [Petrocelli] quite well." Dr. Gerow's last statement on direct examination went to Petrocelli's future dangerousness. He told the jury: "There is no cure." The prosecution's closing argument summarized the reports of the doctors who had evaluated Petrocelli, but relied most heavily on Dr. Gerow's testimony. The prosecutor adopted Dr. Gerow's terminology, referring to Petrocelli as "a . . . psychopathic," and ended his remarks about Petrocelli's "psychopathic" diagnosis by saying: "And we can go to Dr. Gerow. . . . [T]he sad and terrifying fact is [Petrocelli] will continue to do this."

To make matters worse, the prosecutor emphatically, repeatedly, and incorrectly emphasized that Petrocelli could someday be released if the jury did not sentence him to death. The prosecutor asked the jury: "Should the community bear the risk of ever having this defendant on the street again, walking free, on the run?" He elaborated:

---

appointed counsel when Dr. Gerow interviewed him; (2) the incorrect statement that Dr. Gerow informed Petrocelli that he would see him again on an "'as needed' basis"; (3) that it is not entirely clear for what purpose Dr. Gerow saw Petrocelli (perhaps not as an agent of the prosecutor); and (4) that any error was harmless because "[t]he jury heard other compelling evidence about Petrocelli's violent propensities during the guilt phase of his trial." Like the majority, I conclude that the State has not raised any persuasive defense to the alleged *Estelle* violation.

> What psychopath means, essentially, is a mean, bad person who has never changed and who will continue to victimize. . . . [N]o society, no community, no county, no city, no state, should ever have to risk again Tracy Petrocelli on the street. They should not have to risk their fathers or daughters, or their brothers or themselves, that he might take a fancy to killing them as he has done, as you see from the people in this case . . . .

In his rebuttal, the prosecutor continued:

> But ladies and gentlemen, I ask you to consider years down the road when the decisions are being made at the Pardons Board and the Parole Board and we have all gone our separate ways and Mr. Petrocelli is there, the sole person applying for the pardon or applying for parole crying tears of remorse and telling the people how it wasn't he who was the murderer of Mr. Wilson it was an accident and he got railroaded, and telling people that it wasn't he who was the murderer of Melanie it was an accident, and he was railroaded.

Contrary to these statements, Petrocelli categorically was *ineligible* for parole under Nevada law at the time of his sentencing because he was on probation when he murdered James Wilson. Had the jury sentenced Petrocelli to life in prison without the possibility of parole, the State Board of Pardon Commissioners (Board) would not have had the power to release him. *See* Nev. Rev. Stat. § 213.1099(4)(e)

(prohibiting the reduction of a sentence to one allowing parole if the convicted individual had "[failed] in parole, probation, work release or similar programs").

There is no question the prosecutor was aware that Petrocelli was on probation and had failed in "similar programs" at the time of this crime. Petrocelli had been convicted of kidnaping and he had twice left a drug treatment program. The prosecutor argued that Petrocelli's previous conviction for kidnaping should be treated as an aggravating factor, and he cross-examined Petrocelli about leaving the drug treatment program.

On appeal, the State's only defense of Jury Instruction 5 and the prosecutor's strong suggestion that Petrocelli could be granted parole if not sentenced to death, is that, at the time of the trial, Nevada's Board *generally* had the authority to commute a sentence of life without the possibility of parole. But that general rule had no application in Petrocelli's case. Petrocelli was ineligible for parole under Nevada law because he was on probation at the time of this crime and had twice absconded from a drug rehabilitation program. The Nevada Supreme Court declined to grant Petrocelli relief on the basis of Jury Instruction 5, but it did not rule that the instruction was correct; it directed trial courts to tell future juries: "Life imprisonment without the possibility of parole means exactly what it says, that the Defendant shall not be eligible for parole." *Petrocelli v. State*, 692 P.2d 503, 511 (1985), *holding modified after statutory amendment by Sonner v. State*, 930 P.2d 707 (1996).

The backdrop for the prosecutor's egregious *Estelle* trial error was this incorrect statement of Nevada law suggesting the possibility of parole, which the prosecutor hammered

during closing argument. If this combination of errors does not put Petrocelli's case in *Brecht*'s footnote nine category, the scale certainly tips when one considers that these were not isolated incidents or inadvertent mistakes. In September 1983, the same prosecutor's office called Dr. Gerow to testify about a defendant's future dangerousness during the penalty phase of another death penalty case, *Sechrest v. Ignacio*, 549 F.3d 789, 798–99 (9th Cir. 2008). In *Sechrest*, Dr. Gerow was originally hired by defense counsel but he switched sides to become a prosecution witness. *See id.* at 816. Our decision in that case explains that Dr. Gerow interviewed Sechrest without giving him *Miranda* warnings or otherwise informing the defendant or his counsel that he might testify for the prosecution. *See id.* at 798–99. We concluded in *Sechrest* that "Dr. Gerow's testimony that [the defendant] was extremely dangerous and could not be rehabilitated likely had a substantial influence on the jury's decision to sentence [the defendant] to death." *Id.* at 813.

Further, Petrocelli's trial was not the last capital case in which this prosecutor's office inaccurately represented that the defendant would be eligible for parole if the jury did not impose the death sentence. In *Sechrest*, the prosecution told the jury that "the Board of Pardon Commissioners could change [the defendant's] sentence," *id.* at 798, and warned that if it did not impose a death sentence, it was "risk[ing] the life of some other person or child," *id.* at 811 (alteration in original). As a matter of fact and law, that was not true. Sechrest, like Petrocelli, was ineligible for parole because he was on probation at the time he committed his offense. Just like in Petrocelli's case, an inaccurate jury instruction "reinforced the prosecutor's argument that the Board of Pardon Commissioners was the entity responsible for deciding Sechrest's term of imprisonment." *Id.* at 812.

In *Sechrest* we held: "Bottom line: the prosecutor misled the jurors to believe that if they did not impose the death penalty, [the defendant] could be released on parole and would kill again. In making his erroneous assertions, the prosecutor . . . most likely inflamed the passions of the jury." *Id.* at 812. *Sechrest* establishes that this prosecutor's office had a game plan to disingenuously scare the jury about the likelihood that the defendant might be released to walk Reno's streets again.

In my view, Petrocelli's appeal presents "the unusual case where the combination of misconduct and error infected the entire proceeding." *Hardnett*, 25 F.3d at 880 (internal quotation marks omitted). The prosecution's misuse of Dr. Gerow, coupled with the inflammatory and incorrect statements of Nevada law it used in at least two capital cases, pushes this case across the line into footnote nine error of the sort that led two other appellate courts to grant habeas relief. *See United States v. Bowen*, 799 F.3d 336 (5th Cir. 2015); *United States v. Harbin*, 250 F.3d 532, 545 (7th Cir. 2001).

*Bowen* arose from the prosecution of five former police officers involved in the killing of two unarmed men after Hurricane Katrina (the "Danziger Bridge shootings") and an alleged cover-up. *Bowen*, 700 F.3d at 339–40. Federal prosecutors in charge of the case engaged in a series of "ethical lapses" during the high-profile trial. *Id.* at 339. Although the Fifth Circuit could not conclude that the prosecutorial misconduct was "outcome-determinative," *id.* at 356, the court held that footnote nine error occurred when prosecutors leaked confidential information, anonymously posted on online news sources, and withheld information from the district court, *id.* at 339–46, 353–54. According to the Fifth Circuit: "The [prosecutors'] online commenting

alone, which breached all standards of prosecutorial ethics, gave the government a surreptitious advantage in influencing public opinion, the venire panel, and the trial itself." *Id.* at 353. "This case thus presents the unclassifiable and pervasive errors to which the Supreme Court referred in *Brecht* when it identified a category of errors capable of infecting the integrity of the prosecution to a degree warranting a new trial irrespective of prejudice." *Id.*

The Seventh Circuit considered an egregious error that similarly tipped the scales in favor of the prosecution in *Harbin.* There, the prosecution, but not the defense, was allowed to "save" a peremptory juror challenge until the sixth day of an eight-day trial. *See* 250 F.3d at 537–39. Although no one argued that the alternate juror who replaced the excused juror was biased, the Seventh Circuit held that the error defied the typical harmless error analysis, should be treated as structural, and required reversal, in accord with the "footnote nine exception." *See id.* at 544–48. The Seventh Circuit reasoned: "[T]he error was serious enough to effect a shift in the total balance of advantages in favor of the prosecution, which . . . could deprive defendants of a fair trial." *Id.* at 547.

So too here. The prosecutor's *Estelle* violation and other misconduct shifted the total balance of the penalty phase. This misconduct was deliberate, and egregious, and it compromised the integrity of the trial to a degree warranting a new sentencing trial with or without a showing that the errors actually influenced the jury's verdict.

For these reasons, I respectfully concur in the majority opinion, but I would also grant habeas relief based on *Brecht*'s footnote nine.